**WOLTERS VILLAGE MANAGEMENT COMPANY, Graybar Electric Company, and T. R. Barnard, Appellants,**

v.

**The MERCHANTS and PLANTERS NATIONAL BANK OF SHERMAN et al., Appellees.**

**No. 15375.**

United States Court of Appeals
Fifth Circuit.

May 25, 1955.

Norman R. Crozier, Jr., Dallas, Tex., for Wolters Village Management Co.

David Wuntch, Dallas, Tex., Walter A. Cober, Grand Prairie, Tex., for T. R. Barnard.

Thompson, Knight, Wright & Simmons and Sam H. Boren, Dallas, Tex., for Graybar Electric Co., Inc.

Joe A. Keith, Sherman, Tex., Ralph F. Malone, Dallas, Tex., and Malone, Lipscomb & Seay, Dallas, Tex., and Keith & Kennedy, Sherman, Tex., of counsel, for The Merchants and Planters National Bank of Sherman.

William B. David, J. A. Gooch and Cantey, Hanger, Johnson, Scarborough & Gooch, Fort Worth, Tex., for Houston Fire and Casualty Ins. Co.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This many-sided case involves chiefly the effectiveness of a security arrangement in which a prime contractor promised a subcontractor to render payments by checks made out jointly to the subcontractor and his prospective creditor; whether the latter, after advancing money in reliance on the promise, was estopped by his conduct thereafter to complain of the obligor's failure to make out the checks jointly; and finally whether two mechanics' liens were validly imposed.

Appellant Wolters Village Management Company, a Delaware corporation (hereinafter "Wolters") was the prime contractor for the construction of 500 dwelling units on the leasehold estate of Wolters Village, Inc., on Wolters Air Force Base, Texas. Wolters subcontracted certain work to Central Electric Company (hereinafter "Central"), a partnership consisting of Moody and Falck, and Central gave a performance bond to Wolters in which the Houston Fire and Casualty Company was surety. Thereafter, Falck came to see the vice-president of Wolters, Mr. Dunlap, and asked if it would be agreeable for Central to make an assignment to the appellee Merchants and Planters National Bank. Dunlap agreed and signed a letter which read as follows:

"Central Electric Company
Electrical Contractors
211 West Hoover Avenue
Box 423
Killeen, Texas
"Wolters Village Management
Company
722 Eastern Avenue
Dallas, Texas
"Gentlemen:
"We wish to extend an assignment of all monies to Wherry Housing project, Mineral Wells, Texas, F.H.A. Project No. 113–80008–Air Force No. 7, to Merchants & Planters National Bank, Sherman, Texas.
"All checks for gross amount of contract $60,500.00, shall be made payable jointly to the Merchants & Planters National Bank and Central Electric Company.

"Yours very truly,
Central Electric Company
By Alvin H. Falck /s/
"Accepted by:
Central Electric Company,
Killeen, Texas
Alvin H. Falck /s/
Partner
Hal A. Moody /s/
Partner
"Accepted by:
Wolters Village Management Company
B. P. Dunlap /s/
Vice Pres."

On August 10, 1953, upon presentation of this letter and the $60,500 subcontract between Central and Wolters, the Bank made a loan to Central in the amount of $20,500, taking as further security therefor a demand note, a chattel mortgage on motor vehicles (estimated to be worth $2500) and a preexisting assignment of Moody's life insurance policy, of a value of $1500 to $1700. The Bank did not notify Wolters of this.

As the work proceeded and Central submitted estimates, Wolters made six progress payments to Central by checks, all of which were made out not jointly,

as provided in the letter, but solely to Central, on dates and in the amounts as follows:

| | |
|---|---|
| October 12, 1953, | $18,900 |
| November 2, 1953, | 8,400 |
| November 23, 1953, | 5,040 |
| December 2, 1953, | 9,660 |
| December 17, 1953, | 5,400 |
| January 11, 1954, | 5,400 |

Central deposited only the first and last of these checks in the Bank, which applied one half of each to repayment of the note and credited the remainder to Central's bank account. The other four checks were negotiated by Central to creditors or for cash, and no part of these amounts was applied to the Bank loan. There is no evidence to show that the Bank knew of the payment of the four checks given to Central in November and December.

The Bank did not inform Wolters that the checks were not made out in accordance with the letter. It proceeded to make further advances of credit to Central:

February 10, 1954—the Bank took a demand note for $8,374.72, the balance due on the original note, in discharge thereof.

January 22, 1954—Bank lent $5,-200 on Central's note payable in six months.

May 19, 1954 through July 27, 1954—Bank allowed overdrafts on Central's account in the amount of $3,452.64.

August 11, 1954—Bank accepted Central's demand note, in the amount of $3,452.64, to cover the overdraft.

Meanwhile Central was encountering financial difficulties. Appellant T. R. Barnard, who held a subcontract from Central for electrical wiring, and whose contract had been terminated on January 6 without full payment for work then completed, sent Central a notice to perfect lien on March 6, and filed a mechanics' lien on April 7, 1954.[1] On March 5 Central assigned its claim for $8,700 yet unpaid on its subcontract, to its unpaid materialman, the appellant Graybar Electric Company, which on April 22 gave notice and filed its mechanics' lien for $8,700.

The Bank commenced this action on July 1, 1954, for $19,788.73, against Wolters as defendant, basing its claim on the letter agreement. Jurisdiction was properly based on diversity of citizenship. Wolters answered, denying that there was any assignment, and asserting that the Bank was estopped to set up the letter agreement because of its silence when it knew Wolters was making disbursements by checks payable to Central alone. By leave of court, Wolters then filed a third party complaint against Central, Moody and Falck both individually and as copartners in Central, Houston Fire and Casualty Company, Barnard, and Graybar Electric Company, Inc.; deposited into court the sum of $8,774.58 admittedly due under the subcontract with Central, praying for distribution of this fund to the claimants entitled to it, for cancellation of the two mechanics' liens, for attorneys' fees and damages from the third party defendants. In answer to this, various answers and cross-claims were filed, the details of which it is not necessary to relate.

---

1. The itemization of labor done and materials furnished, contained in Barnard's lien affidavit read as follows:

"1000 switch boxes $14.50 per 100 .......................$145.00
20 transformers $1.00 each .. 20.00

Total $165.00
"Amount past due and unpaid for materials furnished * * * $165.00 and from unpaid labor and work done * * *

$3,292.40; September 14, 1953 to January 6, 1954, inclusive, for labor and work done and materials furnished under the electrical contract between Central Electric Company and the undersigned. Original contract price $14,500.00 amount paid $11,205.60 and amount due and unpaid is $3,392.40. The total amount due and unpaid as of this date for labor and material furnished is $3,459.40."

The case was tried to a court without a jury, which adjudged that the Bank should recover $19,788.73 of Wolters; directed the clerk to distribute the $8,774.58 by paying Graybar $2,732.64 and the Bank $6,041.94; cancelled the mechanics' liens, denied any relief to Barnard, and denied all claims against the surety, Houston Fire and Casualty Company and Central. From this judgment Wolters, Graybar and Barnard have appealed.

■ The primary question is the effect of the letter agreement. The complaint referred to this as an assignment. The trial court said in its oral opinion: "I find as facts, Gentlemen, that the bank was dealt with as the lender, not as the assignee, but as the lender of the monies. * * * So that the money that was borrowed from the bank should be paid by the borrower, therefore, judgment should go against the Wolters Village Management Company for the amount of the loan which has been unpaid, that is, the amount of $19,788.73." Since the material facts are undisputed, we are to ascertain the legal effect of the letter from the intentions of the parties as objectively manifested in the letter, construing that instrument in its entirety. It is clear that in general a right expected to arise in the future may be the subject of an assignment, if expected to arise under a contract in existence at the time of the assignment. 5 Tex.Jur. 11; Restatement, Contracts § 154(1). Since Central's subcontract was in existence, its claim could have been assigned. But an assignment must be "a manifestation to another person by the owner of a right indicating his intention to transfer, *without further action or manifestation of intention,* his right to such other person or a third person." Restatement, Contracts § 149(1). (Emphasis added.) The language of the letter does not admit of this construction; it did not state "we have assigned" or "we hereby assign," but "we wish to extend an assignment." Thus it clearly contemplates some further act to complete the transfer of the right. For the same rea-

son, the letter was not the kind of order drawn on a debtor for a part of a particular fund, which is effective as an assignment. 5 Tex.Jur. 34; Restatement, Contracts § 163(1).

■ Consequently, the assignment was not made by means of this letter, but was completed later, in the transaction between Central and the Bank. If the Bank's rights depended solely on the subsequently completed assignment, it would have no right against Wolters here, because a debtor is entitled to credits for payments made before notice of the assignment, 5 Tex.Jur. 40–42; Restatement, Contracts § 167(1), and according to one Texas case, also for payments made after notice of the assignment if they reasonably appear necessary to enable the assignor to perform his duties under a building contract upon the performance of which his right to payment is dependent. Peden Iron & Steel Co. v. McKnight, 60 Tex.Civ.App. 45, 128 S.W. 156.

■■ But the Bank's rights do not rest solely upon the assignment. We cannot agree with the trial court's finding that Wolters and not Central was the actual borrower, for this is contrary to all the evidence; however, it seems clear that the letter was actually a contract for the benefit of the Bank, which the Bank may enforce. It amounted to a promise by Wolters (see Restatement, Contracts § 2(1)) to make all checks under the Central subcontract payable jointly to Central and the Bank. The consideration for this promise was the relinquishment by Central of its right to be paid in checks made to its order, or in whatever manner was provided in the subcontract. The purpose of Central in obtaining the promise was plainly to confer upon the Bank a right against Wolters not then due from Central to the Bank; the Bank was therefore a donee beneficiary which can sue upon Wolters' promise. 10 Tex. Jur. 483; Restatement, Contracts § 133 (1) (a), § 135. Texas law imposes a further requirement on the beneficiary's right to sue, namely that he "accept" the contract. 10 Tex.Jur. 484. This so-

called acceptance does not have to be communicated to the promisor, however.

"In those cases where it is held if the [beneficiary] has in some manner acted upon the promise of the [promisor] that the liability of the latter becomes fixed, it is not claimed that this action must be such as would create an estoppel against the [beneficiary]. It seems to be sufficient if it is such as to evince an acceptance or an adoption of the promise by the [beneficiary] * * * all of the cases * * * concede that the promise * * * becomes irrevocable when the [beneficiary] has in some manner acted upon it". Hill v. Hoeldtke, 104 Tex. 594, 142 S.W. 871, 874, 40 L.R.A.,N.S., 672.

See also Hildebrand, "Contracts for the Benefit of Third Parties in Texas," 9 Tex.L.Rev. 125. In this case the Bank so acted by making the loan to Central.

■ We are satisfied that all the elements of an enforceable promise for the benefit of a third party were present; that the promise itself was not subject to any conditions; and that it was breached. Therefore, the Bank may recover. But we think the court below applied an incorrect measure of damages. The Bank is not necessarily entitled to recover the unpaid balance of its loans to Central, but only for the losses caused by the breach of contract. Since it appears that the Bank has other security and it does not appear that the partners Moody and Falck cannot pay the debt for which they are primarily liable, the Bank's recovery must in any event be diminished to the extent that it can recover from those sources. It is significant that the Bank concedes this in its brief: "We candidly admit that the judgment should be appropriately reformed." [2]

Wolters contends that the Bank "waived" the breach, or is estopped to recover at all, because of its failure to notify Wolters that the latter had breached its contract. The extent to which contract liability may be thus "waived" is not a simple matter. Williston, Vol. 3, § 690, points out that excusing another from performance of a condition is an entirely different matter from excusing him from liability on an obligation.

"It is entirely possible that the performance of an act be excused as a condition, and yet not excused as an obligation. A voluntary statement by a creditor, even before a debt has become due, that the debt need not be paid would generally not be held to excuse the debtor from liability. * * * But if the payment of the debt were a condition qualifying a promise by the creditor, the latter's statement that he would perform his promise irrespective of payment of the debt would waive the payment as a condition, though not as an obligation, if the debtor in reliance on the statement failed to pay. It may, however, sometimes operate as a fraud to enforce liability on a promise after the promisee has stated that performance need not be

---

2. As we indicate below in footnote 5, this third party beneficiary contract was a form of suretyship in the broad sense. It is true that in the usual kinds of suretyship, the creditor has no duty to enforce his security interest in property of the principal before resorting to the surety. He may sue the surety immediately and obtain full recovery, leaving it to him to foreclose any security in the principal's property, under his right of subrogation. It may well be that if the Bank's rights here were based only on a security assignment (which given the present circumstances would be another form of suretyship relation), it would be entitled to recover in full from Wolters without resorting first to collateral security. See Restatement, Security, §§ 130, 131, and comments thereto. However, the intentions of the parties as manifested in the words of the surety's promise must be held controlling in this regard. Cf. Restatement, Security § 131(2) (b). Since the Bank concedes that it should resort to the collateral and to its remedy against the principal debtors first, we hold that that is the proper construction of the contract.

made; and where this is true the promissory estoppel due to the justifiable reliance on the statement should excuse liability.[3] This may be called waiver of liability as distinct from waiver of a condition or excuse. * * *

"Cases may be found where promises to give up a right to damages for an accrued breach of an obligation have been enforced without either consideration or promissory estoppel, just as promises to forego excuses have been similarly enforced. But such decisions are necessarily at variance with the ordinary requirements for the discharge of obligations."[4] 3 Williston, Contracts (Rev.Ed.) § 690.

Again, at § 139, Williston says:

"Promises of future action, it is generally held, if they can furnish the basis of an estoppel at all, can do so only where they are related to an intended abandonment of an existing right, and are made to influence others who in fact are induced thereby to act or to forebear."

 We do not think that this is a case falling within these principles. That there was not a true estoppel is clear, there being no misrepresentation of fact. As for the theory of "waiver of liability" based on promissory estoppel, it seems to us that there is no evidence from which it can properly be inferred that the Bank acted as it did to influence Wolters, or that it did anything which could be the basis of *reasonable* reliance

by Wolters. Even supposing that the Bank did not exercise reasonably sound banking practices in supervising its borrowers and giving notice to sureties and the like (a supposition contrary to fact, as we believe), still there was not the element of reasonable reliance. Here Wolters should have known it was bound to make out the checks as it had promised, and the only kind of conduct or representation which would be a basis of reasonable reliance on its part under these circumstances, would be the affirmative assurance by the Bank that it would not be held on its promise. That is the sort of conduct—close to deliberate fraud—which we think gives rise to a "waiver of liability," distinctly an oddity in the law of contracts where consideration or seal is so important. The mere inaction on the Bank's part cannot be its equivalent. City of Del Rio v. Ulen Contracting Corp., 5 Cir., 94 F.2d 701.

 Nor do we regard the failure of the Bank to notify Wolters of its breach of contract to make the checks out jointly as a proper basis to hold that the Bank failed to mitigate damages, because we think that it acted reasonably in the premises, relying on Wolters' promise. The Bank President testified on cross-examination:

"Q. Now, did you notify the Wolters Village Management Company, or did anyone in your bank notify any officer, agent or employee of that company, to make the checks payable to Central Electric Company and the Merchants & Planters Bank

3. "There is often said to be an estoppel here and the case is said to be distinguishable from waiver, but there is not a true estoppel, for there is no misrepresentation of an existing fact. It may be called a promissory estoppel." Id., § 679.

4. "Waiver is a troublesome term in the law. Its use is not confined to conditional contracts, and any satisfactory discussion of it must consider all its applications. It is used with different meanings and there are, therefore, necessarily conflicting judicial statements as to its requisites. The common judicial definition is 'an intentional relinquishment of a known right,' or words of similar import. This definition is open to criticism for more reasons than one. In the first place it is likely to be understood as implying that any intentional relinquishment of a known right is necessarily effective. This is, of course, unsound. A contract right or other chose in action, as a rule, can no more be relinquished than created without consideration or a sealed instrument. A release or an accord and satisfaction is the ordinary way by which contractual rights are ordinarily relinquished." Id., § 678.

jointly? A. No, sir. We didn't. The letter said they would."

This unadorned statement suffices to support the implied finding of the court below that the Bank acted in justifiable reliance on the letter, and that therefore there was no failure to mitigate damages.[5]

The brief of appellant Wolters discusses numerous cases which are claimed to support its position, but most of these are so inapposite to the issues as we view them, having eliminated the assignment theory from our *ratio decidendi*, that they require no discussion. One case, however, Citizens National Bank at Brownwood v. Ross Const. Co., 146 Tex. 236, 206 S.W.2d 593, 594, bears some considerable similarity on its facts. There, the prime contractor wrote a letter to the bank, stating that the subcontractor "has requested that we give you this letter with instructions that all payments to him under these contracts are to be made payable jointly to Citizens National Bank, Brownwood, and the" subcontractor. The Bank made the loan and the prime contractor made progress payments by checks made out jointly. The subcontractor breached his contract by failing to pay a materialman, whom the prime contractor then became obligated to pay by reason of a federal statute. The contractor took $10,000 of the balance owing to the sub-contractor and instead of paying it out by joint check as before, satisfied the claim of the materialman. The bank then sued the prime contractor, as in this case. The Texas Supreme Court held (1) that there was no assignment; (2) that there was no promise by the prime contractor to make out the checks jointly, but only a recitation that it had been instructed to do so by the subcontractor; and (3) even if there was such a promise inferred in fact, it was only to make "payments * * under these contracts", and since the contractor was not obligated under the contracts to pay this $10,000 to the subcontractor, it had in no event breached its promise. The Bank therefore could not recover.

The present case is easily distinguishable both because there was an express promise to make payments by joint checks, and also because all the payments made in this case contrary to that promise, were payments to which the subcontractor (and derivatively, the Bank) was entitled. There is no inconsistency between the Citizens Bank case and our holding herein.

As for the matter of the validity of the mechanics' liens, we hold that the trial court did not err. There was ample evidence from which to conclude that neither lien complied with the terms of the statute creating such liens. Article 5453, Vernon's Texas Civil Statutes. The lien affidavit and itemized account of the Graybar Electric Company were filed on April 24, 1954, and showed on their face that all of the items listed had been furnished more than four months prior to filing for record, except for items furnished in January, amounting to $1,100, and there was substantial evidence that these were, to Graybar's knowledge, furnished for use on a different construction project entirely. The evidence showed also that the affidavit and account were defective in failing to show certain credits which should have been stated. Likewise, the lien affidavit of Barnard was defective in that it failed sufficiently to itemize the work and materials furnished. Austin Bridge Co. v. Drake, Tex.Civ.App., 79 S.W.2d 677; Banner Oil & Gas Co. v. Gordon, Tex.Civ.

---

5. While it is true that this third party beneficiary contract created a sort of suretyship in the broad sense (Restatement, Security § 82), it is not within the class of suretyship transactions in which the creditor's right against the surety is subject to the condition subsequent that the creditor exercise due diligence to notify the surety of an extension of credit. While similar in some ways to such transactions, it was an enforceable contract, while the rule of due diligence applies only to *offers* to a unilateral contract or series of unilateral contracts, to be accepted by the extensions of credit. Restatement, Security § 86. Nor do we think that any of the special suretyship defenses have been shown to be available to Wolters.

App., 235 S.W. 945; Trinity Universal Ins. Co. v. Woitaske, Tex.Civ.App., 148 S.W.2d 235; and also because Barnard admitted there might be some error in the figures and that the amount claimed in the lien affidavit included a substantial amount for work which was never performed. Counsel in oral argument said the Barnard claim was for breach of contract, which, of course, included profits. The so-called Constitutional lien provided by Texas Const. Art. 16, § 37, Vernon's Ann.St. is not involved here, because that is held to apply only to claims of prime contractors. 29 Tex.Jur. 462.

From the invalidity of the mechanics' liens it follows that the Houston Fire and Casualty Company was correctly held not liable as surety on Central's performance bond, for those liens were the sole basis of the claim against the surety herein.

As for the claim asserted by Graybar under its assignment of March 5, 1954, from Central of the $8700 balance unpaid on the subcontract, it is so obviously without merit, being subject to the defense of setoff which had already arisen from Central's unjust enrichment at Wolters' expense, that it hardly deserves mention. The singular adjudication that Graybar was entitled to $2,732.64 of the money paid into court was not appealed from.

The trial court clearly erred in failing to grant Wolters a judgment over against Central and the copartners thereof as individuals. It is their debt to the Bank which Wolters is now required to pay, and the evidence showed clearly that Wolters is entitled to indemnity from Central and the copartners for the entire amount of the judgment eventually recovered by the Bank. The recovery over may be regarded as based on money paid by mistake, indemnification, or subrogation.

Consequently, except as to the amount of the Bank's recovery from Wolters, and the denial of recovery over of that amount from Central, Moody, and Falck, the judgment is affirmed. As to those matters only, the judgment is reversed

and the case remanded for further proceedings to ascertain the loss caused by Wolters' breach of contract, and entry of judgment in accordance with the principles herein expressed.

On Petition for Rehearing

TUTTLE, Circuit Judge.

Wolters Village Management Company has filed a petition for rehearing assigning the following grounds:

"1. The Court of Appeals erred in holding that the adjudication that Graybar Electric Company, Inc. was entitled to $2,732.64 of the money paid into Court was not appealed from for the reason that this Appellant appealed from the entire judgment, and since Graybar Electric Company, Inc. failed to comply with the Texas mechanics' and materialmen's lien laws and failed to establish its debt against this Appellant and failed to affix its lien, Graybar Electric Company, Inc. is not entitled to take a part of the fund deposited into the Registry of the Court.

"2. The Court of Appeals erred in holding that Merchants and Planters National Bank did not waive its rights under the contract by not notifying Wolters Village Management Company that Wolters Village Management Company had failed to make the checks out jointly to it and the subcontractor, and for the further reason that they [sic] failed to apply all of the proceeds of the checks that it received upon the indebtedness of Central Electric Company to the bank."

The second ground has been fully considered in our original opinion and requires no further discussion.

As for the first ground, we are of the same persuasion as before, although we did not express it as well as we might have in our opinion, namely, that petitioner did not specify any error which controverted the propriety of the court's allowance of the $2,732.64 to Graybar.

Petitioner's original brief contains in this regard only the following specification of error:

> "9. The trial court erred in its judgment dividing the funds deposited in the registry of the court under the interpleader action between the bank and Graybar Electric Company, Inc. when the court found that the fund deposited should be divided between Electric Company and Graybar Electric Company, Inc."

The meaning of this statement is rather enigmatic on its face, and the brief does not argue or explain the point; however, it is clear from the record what petitioner was driving at, and that the specification does not raise any issue relating to the validity of Graybar's claims or to the propriety of its sharing in the distribution of the deposited funds.[1]

In petitioner's supplemental brief submitted after oral argument, one short paragraph is devoted to the rights of Graybar under the Mechanic's Lien Statute, asserting that: "Neither Graybar nor Barnard followed the statute * * *." However, the recovery allowed to Graybar below was not posited on the validity of its *lien*, but on its claim as *assignee* of Central Electric Company.[2] This was erroneous, for as we pointed out in our opinion, Graybar's assignment was subject to the defense of setoff which had arisen against the assignor before the assignment was made.

The statement in our opinion that "The singular adjudication that Graybar was entitled to $2,732.64 of the money paid into court was not appealed from", was not precisely correct, for Wolters appealed from the entire judgment. But, as we should have said, Wolters did not specify the error committed by the trial court in this regard, which was allowing Graybar to recover this amount by virtue of its assignment; and our Rule 24, subd. 2(b) provides that "Errors not specified * * * will be disregarded * * *." This is the reason we declined to set aside that part of the judgment in the first instance. However, the same Rule also provides, "the court, at its option, may notice a plain error not specified." On further consideration of the matter, it seems to us that allowing Graybar to recover any of the interpleaded funds was so plainly erroneous that we should notice it even though petitioner may never have specified the error properly. Accordingly, the final paragraph of our original opinion is modified to read:

> "Consequently, except as to the amount of the Bank's recovery from Wolters, the denial of recovery over of that amount from Central, Moody, and Falck, and the division of the deposited funds instead of ordering them all to be paid over to the Bank, the judgment is affirmed. As to those matters only, the judgment is reversed and the case re-

---

1. In its oral findings of fact, the court below said:
"I find that an interpleader in the amount of $8,744.00 has been filed, and that that amount should be properly divided, under the testimony, between the Electric Company and the Graybar Electric Company."
But the judgment provided: " * * * that the sum of $8,774.58 tendered into Court by the defendant, Wolters Village Management Company, be divided between Graybar Electric Company, Inc., and plaintiff, The Merchants and Planters National Bank of Sherman * * *."
It is clear that Specification 9 related only to the *lapsus linguae*—or the confusion between Central and the Bank—in the findings of fact, and that it did not attack the validity of the adjudication that Graybar was entitled to recover $2,732.64 of the funds paid into court. We note in passing that the court misstated the exact amount of the fund besides.

2. With respect to the division of the funds deposited, the court below said in its findings of fact:
"I find that there is no mechanic's lien that interferes with this equitable course of these funds."
Graybar's purported mechanic's lien being in the amount of $8,700, it is clear that the court considered it entitled to recover a share of the deposited funds by virtue of its assignment, not its asserted lien.

manded for further proceedings to ascertain the loss caused by Wolters' breach of contract, and entry of judgment in accordance with the principles herein expressed."

The opinion having been so modified, the petition for rehearing is denied.