United States Court of Appeals
Fifth Circuit

**F I L E D**

September 20, 2005

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

NO. 04-10761
_____

HARRIS METHODIST FORT WORTH,

Plaintiff-Appellant,

versus

SALES SUPPORT SERVICES INCORPORATED
EMPLOYEE HEALTH CARE PLAN;
SALES SUPPORT SERVICES INC.,

Defendants - Third Party Plaintiffs - Appellees,
Appellants - Cross Appellees,

versus

TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY;
STANDARD SECURITY LIFE INSURANCE COMPANY OF NEW YORK,

Third Party Defendants - Appellees - Cross Appellants,

BERKLEY RISK MANAGERS,

Third Party Defendant - Appellee.

_____

Appeals from the United States District Court
for the Northern District of Texas
Fort Worth Division

_____

Before JOLLY, HIGGINBOTHAM, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The district court granted summary judgment to Sales

Support Services, Inc. ("Sales Support") and its Employee Health Care Plan, a self-insured employee welfare benefit plan governed by ERISA ("the Plan"), holding that an expectant mother did not sufficiently assign her benefits claim on behalf of her prematurely born twins to the admitting hospital, Harris Methodist Fort Worth ("Harris"). Harris, a Preferred Provider Organization ("PPO") for the Plan, was thus denied recovery for the twins' lengthy hospital stay. Concluding that the assignment of benefits was sufficient; that the Plan authorized assignments to PPOs such as Harris; and that Harris timely filed benefit claims, we REVERSE and REMAND for further proceedings consistent with this opinion.

## I. Background

Brenda Crosson ("Crosson") was an employee of Sales Support Services, Inc. in Fort Worth, Texas, and a participant in the Plan. The Plan was part of the ProAmerica PPO managed care network, which allowed its participants to receive discounted care from designated PPO providers.[1] Sales Support, as the Plan sponsor, administrator, and named fiduciary, reserved the right to determine eligibility for benefits and to construe the Plan's terms. Berkley Risk Managers ("Berkley") served as Sales Support's third-party plan administrator.

---

[1] The Plan defined PPO providers in the following manner:
PPO providers have agreed to provide services to Covered Persons at reduced rates. Therefore, to encourage the use of PPO providers whenever possible, the Plan will generally provide a better benefit for their services. . . .

After only twenty-three weeks of pregnancy, Crosson was admitted to Harris and gave birth on December 31, 1997. Upon admission, she signed a "General Conditions of Treatment" form assigning to Harris the right to receive and enforce payment under the Plan for all medical services provided. The extremely premature twins, Lacie and Kaycee Crosson, weighed less than a pound each and were treated at Harris from December 31, 1997, through April 1, 1998. Their hospitalization cost $666,931.89. Although the Plan paid the charges incurred by Crosson at the hospital, and it concedes the twins were covered through Crosson's Plan participation, it paid nothing for Harris's services to the twins.[2] Harris delivered the Crosson file to its counsel for collection on July 23, 1998.

Harris filed suit under ERISA against Sales Support and the Plan on June 29, 2001, for appellees' failure to reimburse it for services provided to the twins. Sales Support filed third-party claims against both Berkley and its excess loss insurers,[3] Standard Security Life Insurance Company of New York ("SSLIC") and Transamerica (collectively, "Excess-Loss Insurers"), and the Excess-Loss Insurers filed counterclaims against Sales

_____

[2]  Sales Support contends that it paid the $15,000 "retention amount" toward each of the twins, while Harris claims that it has received no payment toward the twins' accounts. Given our conclusion, we need not resolve this particular dispute over the otherwise undisputed facts.

[3]  The facts and procedural history with regard to the Excess-Loss Insurers are omitted because we need not reach these claims. All third parties properly appealed to this court and the district court should reach the merits of these claims on remand.

3

Support. Numerous cross-motions for summary judgment were filed. The district court resolved the competing claims by granting summary judgment against Harris on grounds that (1) because of a defective assignment, Harris lacked standing to sue under ERISA; and (2) the Plan's contractual statute of limitations provision barred Harris's claims. The court accordingly dismissed as moot the claims between Sales Support and the Excess-Loss Insurers. Harris now appeals the court's dismissal of its claims; Sales Support and the Excess-Loss Insurers appeal the dismissal of their competing claims.

## II. Discussion

This court reviews the district court's grant of summary judgment de novo using the same standard as the district court. Royal Ins. Co. of America v. Hartford Underwriters Ins. Co., 391 F.3d 639, 641 (5th Cir. 2004). We review questions of law de novo. In re CPDC, Inc., 337 F.3d 436, 441 (5th Cir. 2003).

Harris contests both aspects of the district court's ruling against it. It is well established that a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim. See Tango Transport v. Healthcare Fin. Servs. LLC, 322 F.3d 888, 893 (5th Cir. 2003). The first inquiry here is thus whether Harris became an assignee of Crosson's ERISA benefits claim for the Crosson twins. If Harris prevails on this issue, the

4

next question is whether the claim was time-barred under the terms of the Plan.

## A. Whether Harris Obtained a Valid Assignment

The district court held that Harris never obtained a valid assignment for the twins' services based on its narrow interpretation of both the hospital's "General Conditions of Treatment" form executed by Crosson and the language of the company's Summary Plan Description ("SPD"). Like the district court, we interpret the assignment form in accordance with Texas contract law principles and the SPD under ERISA principles.

An assignment is "a manifestation to another person by the owner of a right indicating his intention to transfer, without further action or manifestation of intention, his right to such other person or third person." <u>Wolters Village Mgmt. Co. v. Merchants & Planters Nat'l Bank of Sherman</u>, 223 F.2d 793, 798 (5th Cir. 1955) (internal citations and marks omitted); <u>accord</u> RESTATEMENT (SECOND) OF CONTRACTS § 324 (1981) ("It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee. The manifestation may be made to the other or to a third person on his behalf and, except as provided by statute or by contract, may be made either orally or by writing."). Once a valid assignment is made, "the assignor's right to performance by the obligor is extinguished in whole or in part and

5

the assignee acquires a right to such performance." RESTATEMENT (SECOND) OF CONTRACTS § 317(1) (1981); see also FDIC V. McFarland, 243 F.3d 876, 887 n.42 (5th Cir. 2001) ("[I]t is generally true that 'an assignee takes all of the rights of the assignor, no greater and no less[.]") (quoting In re New Haven Projects Ltd. Liability Co. v. City of New Haven, 225 F.3d 283, 290 n.4 (2d Cir. 2000)).

To decide whether Harris became an assignee, we must "examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless." Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004) (internal citations and quotation marks omitted). Contractual terms receive their ordinary and plain meaning unless the contract indicates the parties intended to give the terms a technical meaning. Id. Where a contract is written so that it can be given "a definite or certain legal meaning," it is not ambiguous. Id. However, where a contract is subject to two or more reasonable interpretations, it is ambiguous and extrinsic evidence may be considered. Id.

In addition, ERISA requires that the SPD be "written in a manner calculated to be understood by the average plan participant, and . . . be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022; see also Hansen v. Continental Ins. Co., 940 F.2d 971, 981 (5th Cir. 1991) ("[T]he very purpose of having a summary plan description of the policy is to enable the average participant in the plan to

6

understand readily the general features of the policy, precisely so that the average participant need <u>not</u> become expert in each and every one of the requirements, provisos, conditions, and qualifications of the policy and its legal terminology." (emphasis in original)). <u>Hansen</u> also requires that any ambiguities in the SPD must be resolved in the employee's favor, and the SPD must be read as a whole. 237 F.3d at 512.

Two documents are pertinent to the assignment at issue. The first is the "General Conditions of Treatment" document that Crosson signed upon entering the hospital, several portions of which are relevant. Paragraph 5 provides:

> 5. FINANCIAL AGREEMENT AND ASSIGNMENT OF BENEFITS: In consideration for the <u>services to be rendered to me</u>, I hereby promise to pay for those services in accordance with the rates and terms now in effect at the Hospital, to the extent I am legally responsible for such payment. <u>I hereby assign to the Hospital</u> and any practitioner providing care and treatment to me, <u>any and all benefits and all interest and rights (including causes of action and the right to enforce payment) for services rendered</u> under any insurance policies or any reimbursement or prepaid health care plan . . . .

(emphasis added). At the bottom of the page, the capitalized statement, "THIS IS A LEGAL CONSENT AND ASSIGNMENT OF BENEFITS FORM," is just above where Crosson signed. Immediately below her signature, she wrote "self" on the line identifying her "relationship to patient or legal representative."

Paragraph 1 of the form, labeled "CONSENT TO TREATMENT," states (inter alia): "If I am to receive obstetrical care, this consent is given for any child(ren) born to me during this

7

hospitalization . . . ." Juxtaposing this paragraph's reference to children with the language of paragraph 5 and Crosson's identification of herself as the patient, the district court concluded that the hospital's document effected an assignment to Harris of only the benefits due for treatment of Crosson herself, not those due for the twins' care.

We disagree with the district court's analysis. Taken in its entirety, the form signaled Crosson's intent to assign the twins' claims. First, Crosson expressly consented, through paragraph 1 of the form, to medical treatment for the newborns as well as herself. Second, she consented, in paragraph 4, to Harris's release of all necessary financial and medical records to her newborns' physician and, in broad terms, to any entity processing her health plan claim. Third, she assigned to Harris, in paragraph 5, "any and all benefits and all interest and rights for services rendered under any insurance policies or prepaid health care plan." Fourth, in executing the "Legal Consent and Assignment of Benefits Form," Crosson signed alternatively as "Patient or Legal Representative." "Legal Representative" was defined in the form's concluding section to include the "parent" of a minor patient.

That Crosson designated herself as the "patient" was accurate upon her admission to Harris, because the children had not been born. The designation is, under the circumstances of her admission and the entirety of the form, no more limiting than Paragraph 5's assignment "to the Hospital and any practitioner

8

providing care and treatment to <u>me</u>" of "<u>any and all benefits</u>," etc. (emphasis added). In this grammatically ambiguous way, Crosson also acknowledges in paragraph 5 her personal responsibility to pay for "the services rendered <u>to me</u>" (emphasis added). Under Sales Support's reasoning, however, the latter personal reference would relieve Crosson of all liability to pay for the twins' care. Construing this form as a whole to be an insufficient assignment of benefits for the twins thus leads to absurdity.

The SPD furnishes an additional basis for Harris's claim, as it characterizes the Plan's payment obligations under the subtitle, "Assignments to Providers":

> All Eligible Expenses reimbursable under the Health Care Coverages of the Plan will be paid to the covered Employee except that: (1) assignments of benefits to Hospitals, Physicians, or other providers of service will be honored, [or] (2) the Plan may pay benefits directly to providers of service unless the Covered Person requests otherwise, in writing, within the time limits for filing proof of loss . . .

> Benefits due to any PPO provider will be considered "assigned" to such provider and will be paid directly to such provider, <u>whether or not a written assignment of benefits was executed</u>.

(emphasis added). As a PPO provider, Harris contends that this provision of the Plan constitutes a valid assignment and confers standing to sue. This language is straightforward: Assignments are honored and recognized, with or without a writing. The Plan document covers all participants in the Plan; the fact that Harris also had a standard written assignment form for incoming patients does not diminish the Plan's coverage one way or the other — Harris

9

was merely attempting to ensure that it received a valid assignment from any patient admitted for treatment. Appellees cannot use Harris's admission form as a means to circumvent the Plan's obligations under the plain language of its governing documents.[4] Allowing a contrary result would undermine the relationship agreed to between the Plan and any PPO provider with which the Plan has an existing, "preferred" business relationship.

Appellees respond that if the Plan itself effects an assignment to PPO providers, there would be no need further to add that assignees will be paid directly. Harris's interpretation, they aver, creates an unnecessary redundancy in violation of the maxims of contract interpretation. Why Sales Support would trumpet its self-imposed obligation to pay PPO providers directly, irrespective of an assignment, is perplexing. Had it actually paid Harris directly for the services it rendered to the twins, there would have been no need for a lawsuit.

In any event, applying the rule that SPDs be interpreted from the perspective of a layperson, the reference to direct payment of assignees reasonably explains to Plan members the effect

---

[4] Sales Support invokes <u>Letourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.</u>, 298 F.3d 348, 352 (5th Cir. 2002), for the proposition that a plan can bar assignments in some situations. This may be true, but it does not apply to Sales Support's own plan, which explicitly <u>permits</u> assignments. Moreover, in <u>Letourneau</u>, neither party contested the fact that the plan beneficiary's hospital entrance form constituted a valid assignment of her rights under ERISA to the plan provider despite an anti-assignment clause in the plan documents; the dispute was over that plan's coverage of the services rendered. Because the services rendered in that case were not covered by the plan in the first place, the provider lacked standing. <u>See</u> <u>id.</u> at 352-53.

of an assignment. A layperson would thus be informed that, where possible, benefits would be paid directly to the PPO provider, rather than through the customer. Cf. Hermann Hosp. v. MEBA Med. & Benefits Plan ("Hermann II"), 959 F.2d 569, 573 (5th Cir. 1992)(determining that "the authorization language [within the plan summary at issue] represents nothing more than cautious and prudent 'belt and suspenders' drafting"). The language also protects the Plan from a claim made by a participant after the Plan has already reimbursed the PPO provider. That the benefits are "considered 'assigned'" is a colloquial explanation of a legal term to the beneficiary; this language in no way detracts from the Plan's responsibility to pay the PPO provider as if by express assignment from the beneficiary.

Both Appellant and Appellees try to draw support from Dallas County Hospital District v. Associates' Health and Welfare Plan, 293 F.3d 282 (5th Cir. 2002). In Dallas County, this court held that a plan's broadly worded anti-assignment clause did not prevent an assignment where a separate, more specific clause in the plan allowed assignment to a PPO provider. Id. at 288-89. The result stemmed from a careful analysis of the relevant plan provisions; the case does not require a decision for either party in the instant case. To the contrary, here, after employing the same analysis used in Dallas County and other precedents, we conclude that the Plan itself implied an assignment of the benefits of the Crosson twins to Harris, and the form signed by Crosson upon

11

her admission to Harris did nothing to alter this assignment.

For all these reasons, Harris is an assignee of the twins' benefit claims and has standing under ERISA.

This interpretation of the relevant documents comports with the rationale supporting the assignability of benefits under ERISA-covered plans:

> To deny standing to health care providers as assignees of beneficiaries of ERISA plans might undermine Congress' goal of enhancing employees' health and welfare benefit coverage. Many providers seek assignments of benefits to avoid billing the beneficiary directly and upsetting his finances and to reduce the risk of non-payment. If their status as assignees does not entitle them to federal standing against the plan, providers would either have to rely on the beneficiary to maintain an ERISA suit, or they would have to sue the beneficiary. Either alternative, indirect and uncertain as they are, would discourage providers from becoming assignees and possibly from helping beneficiaries who were unable to pay them "up-front." The providers are better situated and financed to pursue an action for benefits owed for their services. Allowing assignees of beneficiaries to sue under § 1132(a) comports with the principle of subrogation generally applied in the law.

Hermann Hosp. v. MEBA Med. & Benefits Plan ("Hermann I"), 845 F.2d 1286, 1289 n.12 (5th Cir. 1988).

### B. Whether Harris's Claims Were Time-Barred

Because Harris was properly assigned the benefits for the Crosson twins, we must also address whether Harris's derivative claims are barred by the three-year limitations period included in the Plan.

Under ERISA, a cause of action accrues after a claim for benefits has been made and formally denied. Hall v. Nat'l Gypsum

12

Co., 105 F.3d 225, 230 (5th Cir. 1997).  Because ERISA provides no specific limitations period, we apply state law principles of limitation.  See, e.g. Hogan v. Kraft Foods, 969 F.2d 142, 145 (5th Cir. 1992).  Where a plan designates a reasonable, shorter time period, however, that lesser limitations schedule governs. Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan, 160 F.3d 1301, 1303-04 (11th Cir. 1998); Doe v. Blue Cross & Blue Shield United of Wisconsin, 112 F.3d 869, 874-75 (7th Cir. 1997).

This plan requires that any action to recover benefits be commenced within "three (3) years from the time written proof of loss is required to be given."  Additionally, "[w]ritten proof of loss covering the details of the loss" must be given "within ninety days after the date of such loss."  There is no dispute among the parties that three years is a reasonable time period.

The dispute is over how to determine what constitutes a "loss" under the Plan, which contains no explicit definition of "loss."  This determination will be dispositive.  If the Plan required Harris to submit claims for the twins' expenses each day those expenses were incurred, on the theory that each day of hospitalization is a "loss," then the limitations period estops Harris from obtaining reimbursement for all but two days' worth of

13

claims.[5] On the other hand, if the "loss" includes all the charges for the duration of the twins' hospital stay, then the Plan required Harris to submit its claim only after they left the hospital, and the claim for the full award of nearly $700,000 is timely.

Appellees point to the Plan's specification that medical expenses are deemed incurred on "the actual date a service is rendered" and implies that the Plan obliged Harris to submit claims for expenses incurred by the twins on a daily basis. Later in their brief, however, Appellees acknowledge that the date of loss may alternatively run from the dates on which Harris submitted interim billings for services. Harris, by contrast, contends that a reasonable interpretation of the Plan allows recovery of all expenses incurred by the twins because the "loss" should include expenses for the entire hospitalization. According to Harris, the particular circumstances under which the loss occurred — Crosson's giving birth to extremely premature twins and their continuous hospitalization throughout this period — demonstrate that it would have been reasonable for Harris to provide proof of loss to the Plan after the twins' departure. As a result, application of the ninety-day proof of loss requirement, starting on April 1, 1998,

_____

[5]     Harris filed the instant action on July 21, 2001. Three years and ninety days prior to the filing date is March 31, 1998. Thus, if Appellees' view of the Plan controls, Harris can only recover expenses incurred on or after March 31, 1998, two days before the twins left the hospital. If Harris's view prevails, the three-years-and-ninety-days limitations period did not commence until the twins left the hospital April 1, 1998, and thus none of the claim is time barred.

14

would lead to a suit-filing deadline in July 2001.

Resolution of this dispute must stem from the background principle that SPDs must be read and interpreted from the perspective of a layperson. Lynd v. Reliance Standard Life Ins. Co., 94 F.3d 979, 983 (5th Cir. 1996). So viewed, Harris has the better of the argument. The ambiguity in Appellees' interpretation of "loss" is telling.[6] The term is ambiguous because proofs of "loss" must necessarily be filed based on the practicalities surrounding each treatment regime covered by the Plan. Thus, a single doctor visit could require a "proof of loss"; a series of physical therapy treatments for back problems could reasonably generate one or several proofs; a hospitalization may garner one or several proofs. The ninety-day limit (or if applicable, the one-year limit) constitutes a periodic deadline for filing such claims, and such deadlines reasonably assure that claims will not be stale when filed. Appellees, of course, do not contend that Harris, following an interim billing regime, failed to meet the ninety-day cutoffs. It is these deadlines, not the term "loss," that govern

---

[6]   Further bearing on the issue, the Plan contains the following language:

> Failure to furnish such proof within the time required will not invalidate nor reduce any claim if it can be shown that it was not reasonably possible to file proof within such time, provided such proof is furnished as soon as reasonably possible and in no event . . . later than twelve (12) months from the date on which the covered charges were incurred.

The twelve-month extension is in tension with Appellees' position that Harris needed to report complete charges on a daily basis to avoid running afoul of the limitations period.

15

the timeliness of claims.

Sales Support tacitly acknowledges the absurdity of construing "loss" to mean each day's services during the hospitalization, yet it seems equally arbitrary and unrealistic to tie the three-year limitations deadline, as Sales Support advocates, to the dates of each of the hospital's interim bills. Doing so could require the hospital to have filed separate suits to recover for its separately billed charges. We conclude that the term "loss" must be practically construed and varies depending on the circumstances of medical care covered by the Plan; the hospitalization in this case constituted one event of "loss" for purposes of applying the Plan's three-year deadline for filing suit; and that "loss" accrued on the date of the twins' discharge. The hospital timely filed suit.

### III. Conclusion

For the reasons stated above, we **REVERSE** and **REMAND** the case to the district court for further proceedings consistent with this opinion.