# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 11, 2019

No. 18-40863

Lyle W. Cayce
Clerk

DIALYSIS NEWCO, INC., doing business as DSI Laredo Dialysis,

Plaintiff – Appellee,

v.

COMMUNITY HEALTH SYSTEMS GROUP HEALTH PLAN; COMMUNITY HEALTH SYSTEMS, INC.; MEDPARTNERS ADMINISTRATIVE SERVICES, L.L.C.,

Defendants – Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before ELROD, GRAVES, and OLDHAM, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case involves a three-way dispute between an ERISA plan and its administrator, a third-party processor, and a healthcare provider. At its core, this is a contract dispute over whether the administrator and the third-party processer underpaid the provider for hemodialysis treatments received by an employee of the administrator. The district court determined that the provider had standing to bring this lawsuit because an anti-assignment provision in the plan was ambiguous or, in the alternative, because the anti-assignment provision was rendered unenforceable by a Tennessee statute. Holding that

No. 18-40863

the plan's anti-assignment provision is not ambiguous and that the Tennessee statute is preempted by ERISA, we REVERSE, VACATE, and RENDER.

I.

The Employee Retirement Income Security Act of 1974 (ERISA)[1] is "[a]n ambitious statutory scheme" that is "designed 'to protect the interests of participants in employee benefit plans and their beneficiaries' by (1) 'requiring the disclosure and reporting to participants and beneficiaries'; (2) 'establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans'; and (3) 'providing for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Tolbert v. RBC Capital Mkts. Corp.*, 758 F.3d 619, 621 (5th Cir. 2014) (alteration omitted) (quoting 29 U.S.C. § 1001(b)).

Community Health Systems, Inc. is the administrator of an employee health plan governed by ERISA. The plan gives the administrator authority to construe any disputed or ambiguous terms. The administrator delegated the processing of medical claims received under the plan to MedPartners Administrative Services, L.L.C., a third-party processor. MedPartners's responsibilities included making initial benefit determinations and handling first-level appeals; the administrator had authority over second-level appeals and retained "final discretionary authority" to determine benefits eligibility. MedPartners, in turn, subcontracted with Global Excel Management, Inc., for processing claims.

The administrator employed an individual referred to in the briefings as "H.S." In 2012, H.S. began receiving hemodialysis from Dialysis Newco, Inc., a healthcare provider located in Laredo, Texas, that was out-of-network for the plan. The plan stated that medical benefits "must not exceed the Usual and

---

[1] Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. § 1001 *et seq.*).

No. 18-40863

Customary Charges." Usual and Customary Charges were defined by the plan as follows:

> **Usual and Customary Charge.** *Usual Charge* means the amount ordinarily charged by a Provider for any given service, and *Customary Charge* means a charge that falls within the range of the Usual Charges for any given service within the geographic area in which the service is rendered.

On the first day of his treatment, H.S. executed a document styled as an "Assignment of Benefits," which gave the provider the right to submit claims and receive benefits on his behalf. For the first three months, the provider was paid 100% of its billed amount. However, starting with treatment given in December 2012, MedPartners and Global Excel changed course and determined that the Usual and Customary Charge was capped at 200% of what Medicare paid. At issue in this case is payment for more than 100 dialysis treatments provided to H.S. between December 2012 and November 2013. Of the $844,472.02 billed by the provider for those treatments, the administrator paid $68,278.48 (roughly 8%), leaving a balance of $776,193.54.

The provider submitted first-level appeals contesting that it had been underpaid, and Global Excel, with MedPartner's approval, denied those appeals. Notwithstanding the language of the plan, a denial letter sent to the provider stated that "the 'customary' charge is what providers typically accept as payment from all payors, which is on average 200% of the US ESRD Medicare allowable." In March 2014, the provider filed a second-level appeal with the administrator, but the administrator never responded. In November 2015, H.S. executed a second document styled as an "Assignment of Benefits," which gave the provider the right to pursue any legal claims arising out of the

3

medical services it provided. Four days later, the provider brought this lawsuit under ERISA, seeking payment of the $776,193.54 balance.[2]

In the district court, the appellants responded by arguing that the provider lacked standing to bring the lawsuit because the plan contained an anti-assignment provision. However, the district court determined that the anti-assignment provision was unenforceable for two independent reasons. First, the district court concluded that the language of the anti-assignment provision was ambiguous and, as such, it would be construed against the plan. Second, the district court concluded that even if the anti-assignment provision was not ambiguous, the plan's choice of law provision invoked the laws of Tennessee, and a Tennessee statute invalidated any language in the plan that would prohibit assignment to a healthcare provider. The district court rejected the appellants' argument that the Tennessee statute would itself be preempted by ERISA. Having determined that the provider had standing to sue, the district court found that the appellants had abused their discretion by reading a 200%-of-what-Medicare-pays rule into the plan and remanded the claims back to the administrator to determine whether the provider's charges were "usual and customary" as that term is defined by the plan.

The district court denied the appellants' motion to certify an interlocutory appeal on the question of the provider's standing. Thereafter, prior to the standing question reaching us on appeal, the district court rendered judgment on a wide host of other issues that the parties also now contest before us on appeal, including: questions of administrative exhaustion; questions of whether the 200%-of-what-Medicare-pays rule was a permissible reading; questions of whether the district court's subsequent interpretations of the plan were supported by the administrative record; and questions of joint

---

[2] The beneficiary of the plan, H.S., is not himself a party to this lawsuit.

No. 18-40863

and several liability. Because we hold that the district court erred in its determination that the provider had standing to bring the lawsuit in the first place, we reverse, vacate, and render on that ground without reaching any of the other issues that were argued on appeal.

## II.

We review a district court's grant of summary judgment in ERISA cases *de novo*, applying the same standards as the district court. *Humana Health Plan, Inc. v. Nguyen*, 785 F.3d 1023, 1026 (5th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

ERISA does not supply the provider with a basis for bringing its claim directly against the appellants; instead, the provider's standing to bring this lawsuit must be derived from the beneficiary and it is subject to any restrictions contained in the plan. If the provider lacks standing to bring the lawsuit due to a valid and enforceable anti-assignment clause, then federal courts lack jurisdiction to hear the case. *See LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348, 353 (5th Cir. 2002).

As such, we address two issues related to the provider's standing argued by the parties on appeal. First, we address whether the district court erred by determining that the plan's anti-assignment clause is ambiguous and invalid. And second, we address whether the district court erred by determining, in the alternative, that even if the plan's anti-assignment clause is unambiguous it is rendered unenforceable by Tennessee law.[3]

---

[3] Before the district court, the appellants also argued that the "Assignment of Benefits" executed by H.S. were insufficient to give the provider standing to sue for unpaid benefits. The appellants do not raise that contention on appeal; however, as it goes to

No. 18-40863

A.

We first address whether the district court erred by determining that the plan's anti-assignment clause is ambiguous and invalid.

We have previously noted "Congress's intent that employers remain free to create, modify and terminate the terms and conditions of employee benefits plans without governmental interference." *LeTourneau*, 298 F.3d at 352 (citation omitted). As such, we have held that when an ERISA plan contains a valid anti-assignment provision, a putative assignment to a healthcare provider is invalid and cannot bestow the provider with standing to sue under the plan. *Id*. at 352–53.

When interpreting an ERISA plan, the provisions are read "not in isolation, but as a whole." *Dallas Cty. Hosp. Dist. v. Assocs.' Health and Welfare Plan*, 293 F.3d 282, 288 (5th Cir. 2002). The provisions are to be read according to their plain meaning and as they are likely to be "understood by the average plan participant." *Walker v. Wal-Mart Stores, Inc.*, 159 F.3d 938, 940 (5th Cir. 1998) (quoting 29 U.S.C. § 1022(a)(1)).

"When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion." *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (en banc) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Accordingly, we have generally held that where, as here, a plan delegates authority to construe ambiguous terms to the administrator, courts will defer

---

standing, we will address it briefly. We have squarely held—at least in the absence of an enforceable anti-assignment provision—that a direct-payment authorization may give a provider derivative standing to sue for unpaid benefits. *See, e.g., Tango Transp. v. Healthcare Fin. Servs., L.L.C.*, 322 F.3d 888, 889–94 (5th Cir. 2003). Thus, the district court correctly determined that the "Assignment of Benefits" executed by H.S. could have given the provider derivative standing in the absence of an enforceable anti-assignment provision.

to the administrator's "interpretive discretion" of those ambiguous terms. *See Porter v. Lowe's Co., Inc.'s Bus. Travel Acc. Ins. Plan*, 731 F.3d 360, 365 n.13 (5th Cir. 2013); *Smith v. Life Ins. Co. of N. Am.*, 459 F. App'x 480, 484 (5th Cir. 2012) (unpublished) (quoting *High v. E–Systems, Inc.*, 459 F.3d 573, 578–79 (5th Cir. 2006)).[4]  However, we have also held in broad terms that when construing an anti-assignment clause, "any ambiguities will be resolved against the [p]lan." *See Dallas Cty.*, 293 F.3d at 288 (5th Cir. 2002) (citing *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir. 2000)).

Although the parties to this case did not offer any structured arguments disputing the district court's determination that ambiguities *in the anti-assignment clause* should be construed against the plan, we have in the past noted that there is potentially some tension in our caselaw regarding when and how ambiguities in an ERISA plan will be construed against the plan.[5]  We need not address here if ambiguity in an ERISA plan's anti-assignment clause should be construed against the plan, because we hold that the anti-assignment clause at issue in this case unambiguously prohibits assignment.

"Federal common law governs the interpretation of all ERISA-regulated plan provisions." *Ramirez v. United of Omaha Life Ins. Co.,* 872 F.3d 721, 725

---

[4] *See also Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 124 (3rd Cir. 2012) ("[E]very Court of Appeals to have addressed the issue has concluded that a court reviewing a benefits decision for abuse of discretion cannot apply the principle that ambiguous plan terms are construed against the party that drafted the plan." (citing the First, Second, Fourth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits)); *cf. Ramirez v. United of Omaha Life Ins. Co.*, 872 F.3d 721, 725 (5th Cir. 2017) (stating that "[i]f the [ERISA] policy language is ambiguous, then the court should construe the policy against the drafter . . . under the rule of *contra proferentem*").

[5] *See Rhorer v. Raytheon Eng'rs & Const'rs, Inc.*, 181 F.3d 634, 642 (5th Cir. 1999), *abrogated on other grounds by CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) ("[O]ther circuits have held that *contra proferentem* does not apply when the plan administrator has expressly been given discretion to interpret the plan. . . . But . . . this Court uses a unique two-step approach to apply the abuse of discretion standard, and *contra proferentem* may properly be used under the first step."); s*ee also Spacek v. Maritime Ass'n*, 134 F.3d 283, 298 n.14 (5th Cir. 1998), *abrogated on other grounds by Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004).

No. 18-40863

(5th Cir. 2017). We may consider analogous state law as a guide when determining the applicable federal common law. *See Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997). The ERISA plan at issue invokes the laws of Tennessee, and under analogous Tennessee law "[a] contract is ambiguous only when it . . . may fairly be understood in more ways than one[,]" but "[a]mbiguity . . . does not arise . . . merely because the parties may differ as to interpretations of certain . . . provisions[,] . . . [and] court[s] will not use a strained construction of the language to find an ambiguity where none exists." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (citation omitted); *accord Ramirez*, 872 F.3d at 727–28 (looking to very similar Texas law as a guide for determining whether an ERISA plan was ambiguous).

The anti-assignment clause at issue here is reproduced in its entirety below, with annotations added to number each sentence:

> **Assignment**
> **[1]** No Covered Person shall have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge, commute, or anticipate any benefit payment under the Plan to a third party, and such payment shall not be subject to any legal process to levy execution upon or attachment or garnishment proceedings against for the payment of any claims. **[2]** Benefit payments under the Plan may not be assigned, transferred, or in any way made over to another party by a Covered Person. **[3]** Nothing contained in this Plan shall be construed to make the Plan or the Plan Sponsor liable to any third party to whom a Covered Person may be liable for medical care, treatment, or services. **[4]** If authorized in writing by a Covered Person, the Plan Administrator may pay a benefit directly to a provider of medical care, treatment, or services instead of the Covered Person as a convenience to the Covered Person; when this is done, all of the Plan's obligation to the Covered Person with respect to such benefit shall be discharged by such payment. **[5]** However, the Plan reserves the right to not honor any assignment to any third party, including but not limited to, any provider. **[6]** The foregoing does not preclude any assignment of payment to Medicaid to the extent required by law. **[7]** The Plan will not honor claims for benefits brought by a third-

8

party; such third-party shall not have standing to bring any such claim either independently, as a Covered Person or beneficiary, or derivatively, as an assignee of a Covered Person or beneficiary.

The parties contend that our analysis of that clause should be guided by two of our prior ERISA decisions. The appellants contend that our analysis should be guided by our decision in *LeTourneau*, which deemed a similarly-worded anti-assignment clause to be valid and enforceable. 298 F.3d at 349, 353. The appellee contends that our analysis should instead be guided by our decision in *Dallas County*, which deemed an anti-assignment clause to be ambiguous and invalid because another part of the plan expressly authorized assignments. 293 F.3d at 287, 289. The district court concluded that this case was more like *Dallas County*. We disagree.

In *LeTourneau*, a healthcare provider with direct-payment authorization from the beneficiary sued a plan administrator for expenses related to a prosthetic leg, which the administrator declined to pay on the basis that the expenses were not covered services under the plan. 298 F.3d. at 349–50. Like the plan at issue in this case, the plan in *LeTourneau* had very clear language that the benefits could not be assigned, *id*. at 349 ("Medical coverage benefits of this Plan may not be assigned, transferred or in any way made over to another party by a participant."), and that any purported assignments would not be honored, *id*. ("Except as permitted by the Plan or as required by state Medicaid law, no attempted assignments of benefits will be recognized by the Plan."). Also like the plan at issue in this case, the plan at issue in *LeTourneau* allowed the administrator to directly pay the healthcare provider for covered services if authorized in writing by the beneficiary. *Id*. at 349 n.2. Given that language, we stated: "[a]pplying universally recognized canons of contract interpretation to the plain wording of the instant anti-assignment clause leads inexorably to the conclusion that any purported assignment of benefits from

[the beneficiary] to [the provider] would be void." *Id*. at 352.  Accordingly, we reversed and vacated the district court's judgment, holding: "[b]ecause [the provider] had neither direct nor derivative standing to bring this suit, the district court lacked jurisdiction to hear it." *Id*. at 353.

Here, the district court's order conceded that at first glance *LeTourneau* appears to support the appellants' position.  Nonetheless, the district court's order attempted to distinguish *LeTourneau* on the ground that that case dealt with the scope of coverage and not with whether the anti-assignment provision was ambiguous.  We do not think that distinction can bear the weight that the district court's order places on it.  While it is true that the dispute in *LeTourneau* was over whether the services were covered expenses, that case held that the provider lacked standing to challenge the scope of such coverage precisely because of the anti-assignment provision.  *Id.*  Indeed, in *LeTourneau* we expressly declined to consider any of the district court's findings vis-à-vis the scope of coverage.  *Id*.  Thus, *LeTourneau* supports the appellant's argument that an anti-assignment clause with language like the one at issue in this case is unambiguous and valid.

In reading *LeTourneau* to the contrary, the district court's order quotes that opinion as stating: "[T]he contents of the entry form signed by [the participant] . . . did effectively assign to [LeTourneau] her right to receive payments for duly *covered* claims."  *See* 298 F.3d. at 352.  The district court's order suggests that this language means that had the service in question been covered by the plan, the provider would have been entitled to repayment.  However, the portion of *LeTourneau* omitted by the ellipsis reads as follows: "although ineffective to assign her other contractual or statutory rights under ERISA[.]"  *Id*.  When taken as a whole, we believe the better reading of that sentence is that even though the provider could have received payment for covered services notwithstanding the anti-assignment clause, the anti-

assignment clause prohibited it from exercising any right to go to court to challenge the administrator's interpretation of "covered services." It is hard to see why that same logic would not in this case also prohibit a provider from going to court to challenge the administrator's interpretation of "usual and customary charges." After all, whether or not the service was covered was the point of dispute in *LeTourneau*, but we held that the provider lacked standing to bring that challenge.[6]

Turning next to *Dallas County*, we disagree with the district court order's conclusion that that case is controlling here. Like this case, the plan at issue in *Dallas County* "contain[ed] sweeping language forbidding the assignment of benefits." 293 F.3d at 288. However, unlike this case, the plan at issue in *Dallas County* contained a separate provision—the "Network Assignment" clause—which authorized making assignments to healthcare providers "[i]n the clearest of terms." *Id.* Given that language, we held that the Network Assignment clause "plainly" allowed for assignments, that any ambiguity in relation to the anti-assignment clause was construed against the plan, and that the provider therefore had standing to sue for the allegedly unpaid benefits. *Id.* at 288–89.

In this case, the district court's order concluded that *Dallas County* controlled because the sentence in the anti-assignment clause of the plan that authorized direct-payment authorizations (sentence 4), was found to be in

---

[6] The district court and the appellees assert that a footnote from our opinion in *Harris Methodist Fort Worth v. Sales Support Services, Inc.*, 426 F.3d 330, 336 n.4 (5th Cir. 2005), construed *LeTourneau* differently. Without commenting on whether the *Harris Methodist* footnote actually supports the proposition that the district court and appellees cite it for, we note that the holding of *LeTourneau* was that the provider lacked standing to challenge the plan's scope of coverage. *LeTourneau*, 298 F.3d at 353. To the extent that a footnote in *Harris Methodist* can be construed as saying that *LeTourneau* held anything to the contrary, our circuit's Rule of Orderliness dictates that the earlier opinion would control over a later mischaracterization of that opinion. *See, e.g.*, *Harvey v. Blake*, 913 F.2d 226, 228 n.2 (5th Cir. 1990) ("When two panel opinions appear in conflict, it is the earlier which controls.").

conflict with the rest of the sentences in that clause, which prohibited assignment. However, to the extent that the district court's order understood *Dallas County* as holding that a clear direct-payment authorization and a clear anti-assignment provision were in conflict, the district court's order was mistaken. The textual conflict in *Dallas County* was not between the sentence permitting direct payment authorizations and the sentences prohibiting assignment; the conflict there was between the sentence allowing assignment and the sentences prohibiting assignment. Indeed, *Dallas County* suggested that the result might have been different if the Network Assignment clause in that case had permitted direct-payment authorizations rather than assignments. *Id*. at 288 ("Despite the Plan's assertion that the provision merely authorizes *direct payment* to network provisions, we find that the Plan clearly speaks in terms of assignment[.]").

In short, the district court order's ambiguity analysis erred by failing to see the degree of distinction between a direct-payment authorization and a full-on assignment of benefits. A direct-payment authorization means only that the beneficiary tells the administrator to forward the checks owed to him or her on to the provider instead. An assignment of benefits is more than that. An assignment means that the provider has stepped into the metaphorical shoes of the beneficiary and is capable of exercising all the legal rights enjoyed by the beneficiary under the plan, to include suing the plan and/or its administrator over disputes that might arise in the plan's interpretation. As the Seventh Circuit has observed, an "assignment" is "distinct from merely an authorization for direct payment." *Principal Mut. Life Ins. Co. v. Charter Barclay Hosp., Inc.*, 81 F.3d 53, 56 (7th Cir. 1996) (Posner, C.J.). *Accord, e.g.*, *Univ. Spine Ctr. v. Aetna, Inc.*, No. 18-2842, 2019 WL 2149590, at *2 (3rd Cir. May 16, 2019) (unpublished); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014); *Physicians*

*Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1295–96 (11th Cir. 2004).  Thus, a direct-payment authorization and a prohibition against the assignment of benefits are distinct concepts, and they can exist side-by-side without being in conflict or causing ambiguity.

Appellees cite *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959 F.2d 569, 573 (5th Cir. 1992), *overruled by Access Mediquip, L.L.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012), for the proposition that the right to receive direct payment necessarily includes the right to sue for non-payment.  This statement is incorrect as a matter of law and *Hermann* is inapposite as a matter of fact.

As a matter of law, the *Hermann* court explained that the "right to sue for denial of coverage is separate and distinct from the right to sue to recover payment for plan benefits[.]"  *Hermann*, 959 F.2d at 573.  As a matter of fact, the dialysis patient in this case executed an "Assignment of Benefits" that authorized DSI *only* to submit claims on his behalf and allowed C.H.S. to make direct payments to DSI (a direct-payment authorization).  In *Hermann*, the "document expressly assigned to [the provider] 'all rights, title and interest in the benefits payable for services rendered' while reserving to [the patient] only the right to sue 'should coverage be denied.'"  *Id.*  Second, DSI filed this lawsuit just four days after H.S. signed a second "Assignment of Benefits" which assigned H.S.'s rights to medical benefits and reimbursement and authorized DSI to bring suit against a plan or administrator in H.S.'s name with derivative standing.  In *Hermann*, the benefits plan postponed payments on Hermann's claims for three years while it investigated the claim.  *Id.* at 574. Accordingly, the court held that the plan was estopped from asserting the anti-assignment clause.  *Id.*  We reiterate the right to receive direct payment is separate from the right to sue for those payments.

Appellee offers a slightly more nuanced argument for why *Dallas County* should guide this case.  Appellee observes that in at least two places the language of the plan at issue in this case appears to acknowledge that assignments might be made.  First, the fifth sentence of the anti-assignment clause states: "the Plan reserves the right to not honor any assignment to any third party[.]"  Second, a separate provision of the plan, in discussing the administrator's ability to recover payments previously made, states: "You must produce and deliver to the Plan Administrator all assignments and other documents as requested by the Plan Administrator for the purpose of enforcing rights under this provision[.]"  However, the language of the plan here is distinguishable from the language at issue in *Dallas County* in a very important way.  In *Dallas County*, the plan expressly stated, "[i]n the clearest of terms," that "assignment may be made directly to the provider."  293 F.3d at 288.  In this case, the most that can be said is that the Plan *might* agree to pay a third-party provider as a convenience to the Covered Person.  But it no event (1) is the Plan obligated to do that, or (2) is the Plan liable to the third-party provider.

Thus, we conclude that *LeTourneau* provides a better framework than does *Dallas County* for analyzing the ambiguity (or lack thereof) of the anti-assignment language at issue in this case.  Moreover, even without resorting to those cases, we believe that the plan's plain language, as it would be understood by an average plan participant, unambiguously prohibits the assignment of a beneficiary's legal rights.  The anti-assignment clause at issue here articulates that the assignment of legal rights is prohibited in no less than five different ways (*see* sentences 1, 2, 3, 5, and 7).  An average plan participant would understand that language to mean exactly what is says: "Nothing contained in this Plan shall be construed to make the Plan or the Plan Sponsor

No. 18-40863

liable to any third party to whom a Covered Person may be liable for medical care[.]"

We hold that the plan's anti-assignment clause unambiguously prohibits the beneficiary from assigning his or her right to sue under the plan to a third-party provider.  Therefore, if the anti-assignment clause is enforceable, the provider lacked standing to bring the suit, and the district court lacked jurisdiction to adjudicate it.  *See LeTourneau*, 298 F.3d at 353.

B.

We will now address whether the plan's anti-assignment clause is rendered unenforceable by a Tennessee statute.

The plan's choice-of-law provision invokes the laws of Tennessee.  Tenn. Code Ann. § 56-7-120(a) (2012)[7] states:

> Notwithstanding any law, rule, or regulation to the contrary, whenever any policy of insurance issued in this state provides for coverage of health care rendered by a provider covered under title 63, the insured or other persons entitled to benefits under the policy shall be entitled to assign these benefits to the healthcare provider and such rights must be stated clearly in the policy.[8]

However, subject to certain exemptions,[9] ERISA preempts "any and all State laws insofar as they *may* now or hereafter *relate to* any employee benefit plan[.]"  29 U.S.C. § 1144(a) (emphases added).  Because ERISA preempts any

---

[7] The language of § 56-7-120 has since been modified in ways that do not impact the outcome of this case.  *See* 2019 Tenn. Pub. Acts, Ch. 239, § 1 (eff. Apr. 30, 2019).

[8] Before the district court, the parties disputed whether the plan's choice of law provision was enforceable, and, if it was, whether Tenn. Code Ann. § 56-7-120(a)(1) (2012) was applicable.  However, the parties do not raise these arguments on appeal.

[9] 29 U.S.C. § 1144(a) cross-references to 29 U.S.C. § 1003(b) for a list of employee benefits plans exempt from preemption (including government plans, church plans, workmen's compensation plans, foreign plans, and unfunded excess benefits plans).  Section 1144(b)(2)(A) exempts from preemption state laws regulating insurance, banking, and securities.  No party offers a structured argument on appeal that the ERISA plan or the Tennessee statute at issue would fall under any such exemptions.

15

state law that "may . . . relate to" employee benefit plans, the Supreme Court has noted that ERISA's preemption clause has a "broad scope." *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943, 945 (2016) (holding that a Vermont statute imposing reporting requirements on ERISA plans was preempted because "[d]iffering, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability").

There are two categories of state laws preempted by ERISA. First, there is the "reference to" category, wherein "a State's law acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the [state] law's operation[.]" *Id.* at 943 (citation and ellipses omitted). Second, there is the "connection with" category, wherein a state law "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Id.* (citation, quotation marks, and ellipses omitted).

The district court's order concluded that Tenn. Code Ann. § 56-7-120(a) was not preempted by ERISA by relying on our decision in *La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529 (5th Cir. 2006). *Rapides* held that a Louisiana statute which required insurance companies to honor direct-payment authorizations was not preempted by ERISA. *Id.* at 530–31, 541. *Rapides* reasoned that the Louisiana statute did not impermissibly interfere with nationally uniform plan administration because: (1) it did not create any new obligations, it merely changed who the benefits flowed to; and (2) the burden on plan administrators would be minimal because healthcare providers would likely be more efficient in processing claims than would be the average plan participant. *Id.* at 539. The district court concluded that for similar reasons *Rapides* was controlling in this case. The district court further concluded that the Supreme Court's then-recent decision in *Gobeille* did not

impact the preemption analysis for this case because the text of ERISA is silent on assignments (unlike reporting requirements) and because the Tennessee statute purportedly does not expose plans to additional liability.

The question of whether Tenn. Code Ann. § 56-7-120(a) is preempted by ERISA appears to be one of first impression, as the parties do not identify any other judicial opinions addressing the question. However, simply as a matter of plain and ordinary meaning, it seems to us that a state statute requiring plan administrators to honor assignments made to third-party healthcare providers would necessarily "relate to" the administration of those plans. As such, and for the following reasons, we hold that that Tenn. Code Ann. § 56-7-120(a) is preempted by ERISA, and that the district court erred in reaching a determination to the contrary.

We begin by addressing the district court order's conclusion that our opinion in *Rapides* is controlling for this case. We disagree. As the appellants and amici observe, *Rapides* is distinguishable from this case in important ways. As discussed in the previous section of this opinion, a direct-payment authorization and an assignment of the legal right to bring a lawsuit are distinct concepts. The Louisiana statute at issue in *Rapides* required administrators to honor direct-payment authorizations; however, the Tennessee statute at issue in this case requires administrators to honor assignments and all the legal rights that flow therefrom—to include liability to be sued by a third party not otherwise in contractual privity with the plan. Moreover, the Louisiana statute at issue in *Rapides* did not purport to require that plans include specific language, whereas the Tennessee statute does. *See* Tenn. Code Ann. § 56-7-120(a) (2012) (requiring that the right of assignment must be "stated clearly in the policy"); *see also Operating Eng'rs Health & Welfare Tr. Fund v. JWJ Contracting Co.*, 135 F.3d 671, 679 (9th Cir. 1998) (noting that a state law "relates to" ERISA if it "tell[s] employers how to write

ERISA benefit plans" (citation omitted)). Those facts distinguish this case from *Rapides* and push this case towards one wherein the state statute "governs a central matter of plan administration." *See Gobeille*, 136 S. Ct. at 943.

Furthermore, in light of subsequent Supreme Court authority, we conclude that it would be ill-advised to extend *Rapides*'s reasoning to the facts of this case.[10] As the appellants and amici observe, *Rapides* was built upon a starting presumption against ERISA preemption. And for good reason— Supreme Court precedent at the time required as much. *See Rapides*, 461 F.3d at 537 ("[W]e start with the assumption that 'the historic police powers of the States were not to be superseded by [ERISA] unless that was the clear and manifest purpose of Congress.'" (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995))); *id.* at 540 (declining to follow decisions from the Eighth and Tenth Circuits because they were decided pre-*Travelers* and did not apply a presumption against ERISA preemption); *id.* at 541 ("[T]he Supreme Court requires our analysis to start with the assumption that ERISA was not intended to derogate the historic police powers of the states." (citing *Travelers*, 514 U.S. at 654–55)).

However, the Supreme Court has since changed its position on the presumption against preemption where there is an express preemption clause. In *Gobeille*, an ERISA case, the majority's only mention of a presumption against preemption was to reject that any such presumption would control the

---

[10] Though not dispositive to our inquiry, the appellants contend that applying *Rapides* to the facts of this case would put this circuit directly into conflict with at least two other circuits. *See St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield of Ks., Inc.*, 49 F.3d 1460 (10th Cir. 1995); *Ar. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341 (8th Cir. 1991). *Rapides* itself recognized some tension. *See* 461 F.3d at 539–40 (acknowledging that those circuits had concluded that ERISA preempted "similar" statutes). The direct-payment authorization versus assignment language provides a reasoned ground for distinction. However, applying *Rapides*'s reasoning to the anti-assignment provision in this case would seemingly turn that tension into an outright split.

outcome of that case. 136 S. Ct. at 946. Justice Thomas authored a separate concurrence observing that *Travelers* departed from the statutory text and has become difficult to reconcile with the Court's other preemption jurisprudence. *Id.* at 947–49 (Thomas, J., concurring). Only two Justices, writing in dissent, expressed support for *Travelers* and asserted that "[t]he presumption against preemption should thus apply full strength[.]" *Id.* at 954 (Ginsburg, J., dissenting). Then, a few months later, a majority of the Supreme Court expressly held in *Puerto Rico v. Franklin California Tax-Free Trust*, a bankruptcy case, that "because the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause[.]" 136 S. Ct. 1938, 1946 (2016) (citation and quotation marks omitted). *Franklin* then referenced *Gobeille* in a "see also" citation for that proposition. *Id.*

ERISA similarly contains an express preemption clause, *see* 29 U.S.C. § 1144(a), so *Franklin* would seem to direct that we should not apply a presumption against preemption in this case. Appellee argues that we should not read *Franklin* broadly, and that *Franklin*'s language about not presuming preemption where there is an express preemption clause should apply only to bankruptcy cases. However, we do not read the clear language of *Franklin*'s holding on this point as being so limited. Neither have several other circuits. *See Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017) (citing *Franklin* for the proposition that there is no presumption against preemption under the Airline Deregulation Act's express preemption clause); *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017*)* (same); *Atay v. Cty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (same under the Plant Protection Act); *but see Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (declining to apply *Franklin*'s holding on this point to the Food, Drug, and Cosmetic Act because the case involved products liability claims historically

regulated by the states).  Given that *Franklin* specifically references *Gobeille*—an ERISA case—when holding that there is no presumption of preemption when the statute contains an express preemption clause, we conclude that holding is applicable here.  As such, because *Rapides* was built upon a presumption against preemption that the Supreme Court appears to have walked back from, we decline to extend *Rapides*'s reasoning to the facts of this case.[11]

Furthermore, we disagree with the district court order's conclusion that the Supreme Court's decision in *Gobeille*, which dealt with duplicative reporting requirements, is inapposite to this case because the text of ERISA is "silent" on assignments.  The Supreme Court, this court, and other courts have long held that state laws can intrude upon central matters of plan administration or interfere with nationally uniform plan administration even when the text of ERISA itself does not mention the particular aspect in question.  *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983) (rejecting the argument that ERISA's preemption clause can "be interpreted to pre-empt only state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like"); *Tingle v. Pacific Mut. Ins. Co.*, 996 F.2d 105, 109 (5th Cir. 1993) (rejecting the argument that there could not be preemption because "ERISA is silent" concerning the issue); *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 567 (7th Cir. 2002) ("The

---

[11] We are careful to note, however, that this opinion should not be read as concluding that *Rapides* has been abrogated or is otherwise bad law.  *Rapides* rested its holding on the Supreme Court's decision in *Travelers*, and *Travelers* has not been directly overruled by the Supreme Court.  As such, we merely recognize the tension between *Rapides* and intervening Supreme Court decisions, and we decline to extend *Rapides* further. *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (citation omitted)).

No. 18-40863

Supreme Court has recognized . . . situations where ERISA preempts state law but is silent on a topic[.]"); *St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield of Ks., Inc.*, 49 F.3d 1460, 1464 (10th Cir. 1995) ("ERISA preempts state law on the issue of the assignability of benefits . . . [even though] ERISA itself is silent on the issue[.]").

Instead, a good lens for analyzing this case is provided by our opinion in *Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.*, 105 F.3d 1035 (5th Cir. 1997). In that case, a Texas statute purported to require that ERISA plans deal with any provider of pharmaceutical services that was selected by a beneficiary and was willing to abide by the terms of the plan. *Id.* at 1036–37. Noting that ERISA's preemption clause is "deliberately expansive," we held that "the Texas statute relates to ERISA plans because it eliminates the choice of one method of structuring benefits, by prohibiting plans from contracting with pharmacy networks that exclude any willing provider." *Id.* at 1037 (quotation marks and citations omitted). As was the case in *Texas Pharmacy*, the Tennessee statute at issue here purports to eliminate the choice of one method of structuring benefits, by forcing plan administrators to interact with—and potentially be sued by—providers who are not in their networks nor otherwise in contractual privity with them.

Therefore, we conclude that Tenn. Code Ann. § 56-7-120(a) "relate[s] to" ERISA plans because it impacts a "central matter of plan administration" and "interferes with nationally uniform plan administration." *See* 29 U.S.C. § 1144(a); *Gobeille*, 136 S.Ct. at 943. Mandating that plan administrators must assume liability to be sued by third-party providers who are not in privity of contract with them impacts a central matter of plan administration. Furthermore, because states could—and seemingly already do—impose

21

No. 18-40863

different requirements on when such assignments would have to be honored,[12] permitting Tenn. Code Ann. § 56-7-120(a) to govern this plan would interfere with nationally uniform plan administration. To hold otherwise would prevent "ERISA's express pre-emption clause [from] receiv[ing] the broad scope Congress intended[.]" *See Gobeille*, 136 S. Ct. at 943.

\* \* \* \*

In summary, we hold that the anti-assignment clause of the ERISA benefits plan at issue in this case is unambiguous and that the Tennessee statute purporting to invalidate any such anti-assignment clauses is itself preempted by ERISA. Accordingly, we REVERSE the district court's judgment on the issue of whether the appellee had standing to bring this lawsuit, VACATE the district court's subsequent judgments in this case, and RENDER judgment that the case shall be dismissed for lack of jurisdiction.

---

[12] *Compare, e.g.*, Tenn. Code Ann. § 56-7-120(a) (discussing requirements for providing the administrator with notice of such assignments), *with* Tex. Ins. Code § 1204.053(a) (not discussing similar notice requirements).