FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 11, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

———————————————————

ROBIN G. THORNTON; MICHAEL
LUCERO, on behalf of themselves and
other similarly situated,

     Plaintiffs - Appellants,

v.

TYSON FOODS, INC.; CARGILL MEAT
SOLUTIONS, CORP.; JBS USA FOOD
COMPANY; NATIONAL BEEF
PACKING COMPANY, LLC,

     Defendants - Appellees.

------------------------------

RANCHERS-CATTLEMEN ACTION
LEGAL FUND, UNITED
STOCKGROWERS OF AMERICA;
PUBLIC JUSTICE,

     Amici Curiae.

No. 20-2124

———————————————————

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:20-CV-00105-KWR-SMV)**
**(D.C. No. 1:20-CV-00106-KWR-SMV)**

———————————————————

A. Blair Dunn of Western Agriculture, Resource And Business Advocates, LLP
(Marshall J. Ray of Law Office of Marshall J. Ray, with him on the briefs), Albuquerque,
New Mexico, for Plaintiffs-Appellants.

Aaron D. Van Oort (Tyler A. Young, Michael M. Sawers, and Martin J. Demoret, with him on the brief), of Faegre Drinker Biddle & Reath LLP, Minneapolis, Minnesota, and Des Moines, Iowa, for Defendants-Appellees.

Leah M. Nicholls, David S. Muraskin, Public Justice, P.C., Washington, D.C., for Amici Curiae.

_____

Before **TYMKOVICH**, Chief Judge, **LUCERO,** Senior Circuit Judge, and **MORITZ**, Circuit Judge.

_____

**MORITZ**, Circuit Judge.

_____

Plaintiffs Robin Thornton and Michael Lucero allege that defendants Tyson Foods, Inc., Cargill Meat Solutions, Corp., JBS USA Food Company, and National Beef Packing Company, LLC, use deceptive and misleading labels on their beef products. In particular, plaintiffs contend that the "Product of the U.S.A." label on defendants' beef products is misleading and deceptive in violation of New Mexico law because the beef products do not originate from cattle born and raised in the United States.

But the federal agency tasked with ensuring that meat labels are not misleading or deceptive preapproved the labels at issue here. And critically, the governing federal statutory scheme—the Federal Meat Inspection Act (FMIA), 21 U.S.C. §§ 601–695—includes an express preemption provision that prohibits states from imposing any "labeling . . . requirements in addition to, or different than" the federal requirements. 21 U.S.C. § 678. In seeking to establish that defendants' federally approved labels are nevertheless misleading and deceptive under state law,

2

plaintiffs aim to impose labeling requirements that are different than or in addition to the federal requirements. Accordingly, we conclude that plaintiffs' deceptive-labeling claims are expressly preempted by federal law. We further agree with the district court that plaintiffs fail to state a claim for false advertising. We therefore affirm the district court's order dismissing plaintiffs' complaints.

### Background[1]

Thornton is a consumer who purchased defendants' beef from various retail stores. She filed a class-action complaint in state court against defendants, alleging that their labels deceived her and other similarly situated consumers into paying higher prices for beef based on the mistaken belief that it originated from cattle born and raised in this country. Lucero is a "producer of beef cattle with a multi[]generational history of ranching in New Mexico." R. vol. 1, 100. He filed a separate class-action complaint, alleging that he and other similarly situated ranchers are paid less for their domestic cattle as a result of defendants' conduct.

According to both complaints, since 2015, defendants have imported live cattle from other countries, slaughtered and processed the cattle here, and labeled the resulting beef products as "Products of the USA." Defendants place the same "Product of the USA" label on already-slaughtered beef that they import into this country. Plaintiffs allege that these labeling practices are misleading, fraudulent, and

---

[1] We take these facts from plaintiffs' complaints. *See Straub v. BNSF Ry. Co.,* 909 F.3d 1280, 1287 (10th Cir. 2018) (stating that when reviewing ruling on motion to dismiss, we "accept[] as true all well-pleaded factual allegations in a complaint and view[] those allegations in the light most favorable to the plaintiff").

deceptive under New Mexico law. Accordingly, they bring state-law claims for unjust enrichment and violation of the New Mexico Unfair Practices Act (UPA), §§ 57-12-1 to 57-12-26. Thornton additionally asserts a breach-of-express-warranty claim, and Lucero sought to amend his complaint to replace his UPA claim with a claim under the New Mexico Antitrust Act, §§ 57-1-1 to 57-1-19.

After removing both cases to federal court, defendants moved to dismiss.[2] The district court granted the motions and denied Lucero's motion to amend as futile, concluding that federal preemption barred all plaintiffs' claims, including the claim that Lucero sought to add. The district court alternatively concluded that, for various reasons, plaintiffs failed to state a claim under any of their theories of liability, including failing to state a false-advertising claim. It also declined to abstain from exercising jurisdiction under the primary-jurisdiction doctrine. *See TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1238 (10th Cir. 2007) ("Even where a court has subject[-]matter jurisdiction over a claim, courts have discretion to refer an issue or issues to an administrative agency.").

Plaintiffs appeal each ruling. Our review is de novo. *See Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1151–52 (10th Cir. 2005) (stating that we review dismissal orders and preemption issues de novo); *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239 (10th Cir. 2001) (noting de novo review of "district court's refusal to grant leave to amend a complaint based on the court's conclusion that the

_____

[2] The parties agreed to consolidate the cases for pretrial purposes.

4

amendment would be futile").

## Analysis

### I.    Labeling Claims

Plaintiffs argue that the district court erred in dismissing their state-law labeling claims as preempted by federal law. The Supremacy Clause of the United States Constitution grants Congress the authority to preempt state law. U.S. Const. art. VI, ¶ 2 (providing that "the [l]aws of the United States . . . shall be the supreme [l]aw of the [l]and; . . . any[t]hing in the [c]onstitution or [l]aws of any state to the [c]ontrary notwithstanding"). There are different types of federal preemption, but this case involves only express preemption, which "occurs when Congress 'define[s] explicitly the extent to which its enactments pre[]empt state law.'" *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (quoting *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 792 (10th Cir. 2000)). Specifically, this case turns on § 678, the express preemption provision of the FMIA. As relevant here, § 678 prohibits states from imposing any labeling requirements for meat products that are "in addition to, or different than" the requirements imposed by the FMIA.

But before turning to § 678, we first outline the broader federal statutory and regulatory framework. The FMIA "regulates a broad range of activities" related to meat processing, *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012), including "assuring that meat and meat food products . . . are . . . properly marked, labeled, and packaged," 21 U.S.C. § 602. Consistent with this stated purpose, the FMIA prohibits false or misleading labeling, allowing only labeling that is "not false or misleading

5

and [that is] approved by the Secretary" of Agriculture or his or her delegate. *Id.*

§ 607(d); *see also id.* § 601(a) (defining "Secretary"). And the FMIA charges the

Food Safety and Inspection Service (FSIS), an agency of the United States

Department of Agriculture (USDA), "with ensuring . . . that certain commercial meat

products are not misbranded." *United Source One, Inc. v. U.S. Dep't of Agric., Food*

*Safety & Inspection Serv.*, 865 F.3d 710, 711 (D.C. Cir. 2017); *see also* § 601(n)(1)

(defining "misbranded" meat product in part as one with "labeling [that] is false or

misleading in any particular").

 To that end, the FSIS requires manufacturers to obtain preapproval of labels

before using such labels on their products: "No final label may be used on any

product unless the label has been submitted for approval to the FSIS . . . and

approved . . . ." 9 C.F.R. § 412.1(a); *see also* § 607(d) (allowing labels that "are not

false or misleading *and* [*that*] *are approved by the Secretary*" (emphasis added)).

One of the standards governing this review is that labels may not "convey[] any false

impression or give[] any false indication of origin." 9 C.F.R. § 317.8(a). And "to help

manufacturers . . . prepare product labels that are truthful and not misleading," the

FSIS issues a Food Standards and Labeling Policy Book, which "is a composite of

policy and day-to-day labeling decision[s], many of which do not appear in" the

applicable regulations or inspection manuals. FSIS, Food Standards and Labeling

Policy Book 2–3 (2005),

https://www.fsis.usda.gov/sites/default/files/import/Labeling-Policy-Book.pdf

[hereinafter Policy Book]. According to the Policy Book, a label "may bear the

phrase 'Product of the U.S.A.'" if "[t]he product is processed in the U.S. (i.e., is of domestic origin)." *Id.* at 147. Under this view, as the FSIS explained in regulatory commentary, this label "applie[s] to products that, at a minimum, have been prepared in the United States" and does not "mean that the product is derived only from animals that were born, raised, slaughtered, and prepared in the United States." Product Labeling: Defining United States Cattle and United States Fresh Beef Products, 66 Fed. Reg. 41160, 41160–61 (advance notice of proposed rulemaking Aug. 7, 2001).[3]

Notably, this permissive interpretation of what qualifies as a "Product of the U.S.A." has not always been the governing standard; from 2008 to 2015, Congress took a more restrictive approach to country-of-origin labeling. Specifically, in 2008, Congress implemented a new law that established four categories for country-of-origin labeling: United States origin, multiple countries of origin, imported for immediate slaughter, and foreign country of origin. Food, Conservation, & Energy Act of 2008, Pub. L. No. 110-234, § 11002, 122 Stat. 923, 1351–54 (2008). But this new law generated several years of international-trade issues with Canada and Mexico, including two disputes before the World Trade Organization and more than $1 billion in retaliatory tariffs imposed against the United States. *See generally* Joel

---

[3] By contrast, FSIS views "terms such as 'U.S. (Species),' 'U.S.A. Beef,' and 'Fresh American Beef' . . . as geographic claims associated with animal raising and production," denoting "that the cattle to which the terms are applied were born, raised, slaughtered, and prepared in the United States or in specific geographic locations in the United States." 66 Fed. Reg. 41160, 41160.

L. Greene, Cong. Rsch. Serv., RS22955, Country-of-Origin Labeling for Foods and the WTO Trade Dispute on Meat Labeling (2015). As a result, in 2015, Congress repealed the new country-of-origin requirements for beef products, essentially reinstating the pre-2008 status quo. *See id.* at 1; Consolidated Appropriations Act, 2016, Pub. L. No. 114–113, § 759, 129 Stat. 2242, 2284–85 (2015). And that status quo—the permissive interpretation of what "Product of U.S.A." means—is the law that applies here.[4]

Turning to the facts of this case, it is undisputed that—in line with the currently applicable and permissive regulatory framework and meaning of "Product of the U.S.A."—the FSIS preapproved defendants' labels. As a result, the district court concluded that each of the forms of relief plaintiffs sought (injunctions forcing defendants to change their labels and prohibiting defendants from using their labels, as well as damages resulting from defendants' use of their labels) were "all . . . preempted under [§ 678] because they seek to impose different or additional labeling requirements than those found under the FMIA." R. vol. 2, 558. In support, the district court relied on a variety of district-court cases reaching the same result in similar contexts. *See, e.g.*, *Phelps v. Hormel Foods Corp.*, 244 F. Supp. 3d 1312,

---

[4] The dissent acknowledges this recent history but focuses on the broader historical context leading to federal regulation of the meat industry at the turn of the 20th century. Yet this more recent history significantly undercuts the dissent's conclusion that plaintiffs' claims should be allowed to proceed. Although not dispositive, it is certainly relevant that plaintiffs seek to impose—by way of New Mexico law—a similar country-of-origin approach to labeling that Congress specifically repealed in 2015.

1316–18 (S.D. Fla. 2017) ("By attempting to challenge the FSIS-approved [labels] as false, misleading, or deceptive, each of [p]laintiff's claims improperly seeks to impose additional or different requirements on [d]efendant's labeling than those required by USDA."); *Brower v. Campbell Soup Co.*, 243 F. Supp. 3d 1124, 1128–29 (S.D. Cal. 2017) (finding plaintiff's claims preempted because plaintiffs sought to apply state law to impose labeling requirements different from or in addition to federal requirements).[5]

Challenging this conclusion on appeal, plaintiffs first urge us to apply a presumption against preemption. In support, they point to the Supreme Court's statement that "[i]n *all* pre[]emption cases," especially in cases involving an area of law traditionally belonging to the states (like food labeling), the court "start[s] with the assumption that the historic police powers of the [s]tates were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (emphasis added) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). But in more recent years, the Supreme Court has declined to apply such a presumption in express-preemption cases. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938,

---

[5] Some of these cases apply the preemption provision of the Poultry Products Inspection Act (PPIA), 21 U.S.C. §§ 451–473, which is substantively identical to § 678. *Compare* § 678 ("Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any [s]tate . . . ."), *with* 21 U.S.C. § 467e ("Marking, labeling, packaging, or ingredient requirements . . . in addition to, or different than, those made under this chapter may not be imposed by any [s]tate . . . .").

9

1946 (2016) (explaining that for express preemption clause, courts "do not invoke any presumption against pre[]emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre[]emptive intent'" (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011))); *cf. Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (noting that "the Supreme Court has . . . changed its position on the presumption against preemption where there is an express preemption clause"). We have done the same. *See EagleMed LLC v. Cox*, 868 F.3d 893, 903–05 (10th Cir. 2017) (citing *Franklin* and declining to apply presumption against preemption in case involving express preemption provision in Airline Deregulation Act); *Dirty Boyz Sanitation Serv., Inc. v. City of Rawlins*, 889 F.3d 1189, 1198 (10th Cir. 2018) (same but for Federal Aviation Administration and Authorization Act). Accordingly, we do not invoke any presumption against preemption and focus instead on the plain language of the FMIA's preemption provision, "which necessarily contains the best evidence of Congress' pre[]emptive intent."[6] *Emerson*, 503 F.3d at 1129 (quoting

---

[6] The dissent agrees that the plain language of § 678 governs the express-preemption analysis. Yet in our view, the dissent's approach—under which it would adopt an "equally plausible construction of the statute" that disfavors preemption, Dissent 6—would effectively invoke the inapplicable presumption against preemption. And notably, in beginning its purportedly plain-language approach to this "meaty question of statutory interpretation," the dissent focuses *not* on the text of § 678, but instead on the historical backdrop that prompted federal regulation of the meat industry. *Id.* at 1; *cf. also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (quoting *Engine Mfrs. Ass'n S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004))).

*Sprietsma v. Mercury Marine*, 537 U.S. 51, 62–63 (2002)).

Section 678 prohibits states from imposing "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter." This preemption provision "sweeps widely" and "prevents a [s]tate from imposing any additional or different—even if nonconflicting—requirements." *Nat'l Meat Ass'n*, 565 U.S. at 459. And it plainly preempts plaintiffs' labeling claims. The FSIS has already approved defendants' labels, concluding that they are not deceptive or misleading under the FMIA. *See Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1288 (9th Cir. 2021) (noting that when FSIS "reviews and approves a label, the agency is deciding that it is *not* false or misleading"). But plaintiffs seek to impose a different standard, insisting that the labels are nevertheless deceptive and misleading under state law and must be changed. Allowing plaintiffs to do so would impose a requirement different from what the FSIS has already approved as consistent with the FMIA, which is precisely what § 678 prohibits.[7] *See id.* ("[A] plaintiff who brings a state[-]law claim that the approved label is false or misleading is seeking to impose a requirement different from the federal requirements. That state[-]law claim is preempted . . . .").

---

[7] Indeed, as defendants point out, in alleging that the current labels are misleading, plaintiffs essentially seek to impose a labeling standard similar to the more restrictive approach to country-of-origin labeling that Congress implemented in 2008 but abandoned in 2015.

11

This case is indistinguishable from *Webb v. Trader Joe's Co.*, 999 F.3d 1196 (9th Cir. 2021).[8] There, after the plaintiff conducted her own research on the amount of water in the defendant's poultry products, she brought state-law claims alleging that the defendant's retained-water labels were misleading. *Id.* at 1198. The Ninth Circuit held that the claims were preempted under the PPIA's preemption provision. *Id.* at 1204. It reasoned that because "the retained[-]water statement on the label was federally approved," the "additional label requirements" that the plaintiff sought to place on the defendant by means of her own retained-water data "would necessarily be 'different than' those required by the PPIA." *Id.* (quoting § 467e); *cf. Cohen*, 16 F.4th at 1289–90 (reversing and remanding district court's preemption ruling based on insufficient evidence of FSIS approval; emphasizing that on remand, "[i]f the evidence shows that [the defendant's] label was approved by FSIS, then [the plaintiffs'] claims are preempted"). Here, similarly, because defendants' origin labels were federally approved, plaintiffs' claims of misleading labels are preempted. A number of district courts have reached similar conclusions. *See Phelps*, 244 F. Supp. 3d at 1316–18; *Brower*, 243 F. Supp. 3d at 1128–29; *Kuenzig v. Kraft Foods, Inc.*, No. 11-cv-838-T-24, 2011 WL 4031141, at *6–7 (M.D. Fla. Sept. 12, 2011) (finding preempted "any state[-]law claim based on the contention that the labels are false or misleading . . . because such a claim would require [p]laintiff to show that the information stated on the labels should have been presented *differently*" and would

---

[8] The district court relied in part on the Southern District of California's decision that the Ninth Circuit affirmed in *Webb*.

therefore "impos[e] a *different and/or additional* labeling requirement than those found under the FMIA and the PPIA"), *aff'd sub nom Kuenzig v. Hormel Foods Corp.*, 505 F. App'x 937 (11th Cir. 2013) (unpublished) (per curiam); *Barnes v. Campbell Soup Co.*, No. C 12-05185, 2013 WL 5530017, at *6 (N.D. Cal. July 25, 2013) (finding state-law claim that chicken soup was deceptively labeled as "100% Natural" preempted by FMIA, noting that "[b]ecause the USDA and FSIS previously approved of [d]efendant's . . . label, . . . the . . . label cannot be construed, as a matter of law, as false or misleading"); *Meaunrit v. ConAgra Foods Inc.*, No. C 09-02220, 2010 WL 2867393, at *7 (N.D. Cal. July 20, 2010) (finding plaintiffs' labeling claim preempted and citing earlier district-court and state cases rejecting state-law challenges to federally approved labels).

Against this plain language, plaintiffs argue that because § 678 allows states to exercise concurrent jurisdiction to prevent misbranding and because they have alleged misbranding, their claims are not preempted. The concurrent-jurisdiction portion of § 678 provides that "any [s]tate . . . may, *consistent with the requirements under this chapter*, exercise concurrent jurisdiction with the Secretary . . . for the purpose of preventing the distribution for human[-]food purposes of any such articles which are . . . misbranded." § 678 (emphasis added). And the statute further does "not preclude any [s]tate . . . from making requirement[s] or taking other action, consistent with this chapter." § 678.

But both of these provisions contain the same condition: The state's labeling requirements or its exercise of concurrent jurisdiction must be "consistent with" the

13

FMIA. *Id.* And although plaintiffs assert that New Mexico law "require[s] exactly the same thing as is required by federal law," this assertion plainly fails in light of the FSIS's preapproval of defendants' labels. Aplt. Br. 24. That is, plaintiffs assert that (1) defendants' labels are deceptive and misleading under state law and (2) the state law is coextensive with federal law. But the FSIS has already determined that defendants' labels are not deceptive or misleading under federal law. So the state law plaintiffs seek to rely on cannot be coextensive with federal law. Stated differently, plaintiffs' concurrent-jurisdiction argument ignores the critical feature of this case: that under federal law, through the FSIS preapproval process, defendants' products are not misbranded.[9] The states' concurrent jurisdiction over misbranding claims does not change that fact. *See Cohen*, 16 F.4th at 1288 (rejecting argument against preemption based on concurrent-jurisdiction clause in PPIA because such clause only authorizes states "to enforce *federal* requirements" (quoting *Nat'l Broiler Council v. Voss*, 44 F.3d 740, 746 (9th Cir. 1994) (per curiam)); *Kuenzig*, 2011 WL 4031141, at \*4 ("The states' concurrent jurisdiction has been interpreted to mean that states can impose sanctions for violations of state requirements that are *equivalent to* the FMIA and the PPIA's requirements." (emphasis added)); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447 (2005) (interpreting similar preemption clause and noting that "a state-law labeling requirement is not pre[]empted by [7 U.S.C.] § 136v(b) if it is

---

[9] This simple fact undermines plaintiffs' reliance on cases in which state-law claims survived preemption because those claims alleged conduct that violated the FMIA. *See, e.g.*, *Mario's Butcher Shop & Food Ctr., Inc. v. Armour & Co.*, 574 F. Supp. 653, 656 (N.D. Ill. 1983).

equivalent to, and fully consistent with, [Federal Insecticide, Fungicide, and Rodenticide Act]'s misbranding provisions"). Thus, the concurrent-jurisdiction language does not remove plaintiffs' claims from the scope of § 678.[10]

Plaintiffs next suggest that because the label "Product of the U.S.A." is optional, rather than mandatory, their claims are not preempted. This position is similarly doomed by the FSIS's preapproval—the FSIS has already concluded that the label, although not required by federal law, is not deceptive or misleading under federal law. And again, the plain language of § 678 prohibits state requirements that are different than or in addition to the federal labeling rules. Yet for plaintiffs to succeed on their claim that the labels are deceptive and misleading under state law and therefore must be removed or changed would be a different requirement than what the FSIS already approved. We therefore reject plaintiffs' argument based on the nonmandatory nature of the label at issue.

Plaintiffs next attempt to analogize § 678 to the preemption provision in the

---

[10] The dissent also relies on the states' concurrent jurisdiction, as well as the FMIA's requirement that labels be "not false or misleading *and* . . . approved by the Secretary," to conclude that plaintiffs claims should not be preempted. § 607(d) (emphasis added). According to the dissent, the conjunction "and" in § 607(d) "suggests that mere agency approval does not suffice to satisfy the statute." Dissent 6. And the dissent interprets the states' concurrent jurisdiction as "allowing states to enforce the [FMIA's] prohibition against misleading labels when the agency declines to do so." *Id.* Yet the dissent's view overlooks the critical language of the FMIA's preemption provision, which prohibits states from imposing "requirements in addition to, or different than, those made under this chapter." § 678. And allowing plaintiffs' claims to proceed here would effectively allow New Mexico law to impose labeling requirements additional to or different than the labels that the FSIS has already approved as neither false nor misleading.

Federal Cigarette Labeling and Advertising Act (FCLAA), which prohibits states from imposing any "requirement or prohibition *based on smoking and health . . . with respect to the advertising or promotion* of . . . cigarettes." 15 U.S.C. § 1334(b) (emphases added). Courts interpreting § 1334(b) have relied on the emphasized text to determine whether a party's state-law claim is preempted, "ask[ing] whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . imposed under [s]tate law with respect to . . . advertising or promotion.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 524–30 (1992) (plurality opinion) (omissions in original) (quoting § 1334(b)). In *Cipollone*, for example, the plaintiff's "claims that [defendants] concealed material facts [were] not pre[]empted insofar as those claims rel[ied] on a state-law duty to disclose such facts through channels of communication *other than* advertising or promotion." *Id.* at 528 (emphasis added). Likewise, fraudulent-misrepresentation "claims based on allegedly false statements of material fact made in advertisements" were not preempted because they were "predicated not on a duty 'based on smoking and health' but rather on a more general obligation[:] the duty not to deceive." *Id.* at 528–29 (quoting § 1334(b)).

But importantly, the FCLAA's preemption provision is narrower than the FMIA's: The former applies only to "advertising or promotion" that is "based on smoking and health," § 1334(b), while the latter bars any state regulation of meat labeling that is "in addition to, or different than" the federal regulations, § 678. *See Phelps*, 244 F. Supp. 3d at 1317 (finding analogy to FCLAA cases "inapposite

16

because [its] preemption provision[] [is] far narrower than those in PPIA and FMIA"). As a result, the FMIA's preemption provision requires no similar inquiry into the legal duty underlying the state-law claims, and *Cipollone* and its progeny do not affect that conclusion.

Plaintiffs' reliance on district-court decisions in *Parker v. J.M. Smucker Co.*, No. C 13-0690, 2013 WL 4516156 (N.D. Cal. Aug. 23, 2013), and *Kao v. Abbot Lab'ys Inc.*, No. 17-cv-02790, 2017 WL 5257041 (N.D. Cal. Nov. 13, 2017), fails for a similar reason: These are not FMIA cases, so they offer no guidance on the scope of the FMIA's preemption clause. The defendant in *Parker* argued for preemption under the Food, Drug, and Cosmetics Act (FDCA), as amended by the Nutrition Labeling and Education Act (NLEA). 2013 WL 4516156, at *4. The NLEA provides in part that states may not "directly or indirectly establish . . . any requirement for the labeling of food . . . that is not identical to" certain listed provisions in the FDCA. 21 U.S.C. § 343-1(a)(3). Yet this preemption provision "does not purport to preclude all state regulation of nutritional labeling"; instead, it "seems to 'prevent [s]tate and local governments from adopting inconsistent requirements with respect to the labeling of nutrients.'" *Barnes*, 2013 WL 5530017, at *6 (quoting *Astiana v. Ben & Jerry's Homemade, Inc.*, Nos. C 10-4387, C 10-4937, 2011 WL 2111796, at *8 (N.D. Cal. May 26, 2011)). Accordingly, claims arising from aspects of labels not directly regulated by the FDA—such as the term "natural," which the FDA has specifically declined to define—are generally not preempted. *See Parker*, 2013 WL 4516156, at *4 (explaining "that at no point has the FDA stated any intention to alter its

17

longstanding position not to adopt any regulations governing the term 'natural,' regardless of consumers being misled"). Indeed, at least one district court found state-law claims based on chicken-soup labels preempted under the preemption provision in the PPIA (which is identical to § 678) but the same claims based on vegetable-soup labels not preempted under FDCA and NLEA. *See Barnes*, 2013 WL 5530017, at *7. Thus, we conclude that *Parker* is distinguishable and does not provide helpful guidance on whether the FMIA preempts plaintiffs' claims in this case. *See Phelps*, 244 F. Supp. 3d at 1317–18 (explaining that "preemption issues arising under FDCA are distinguishable" from FMIA cases on basis of FSIS preapproval process); *Meaunrit*, 2010 WL 2867393, at *7 (distinguishing FDCA preemption case "because there was no federal pre[]approval of product labeling and thus no inherent issue of imposing different or additional requirements").

*Kao* is similarly distinguishable. It involved the preemption provision in the National Bioengineered Food Disclosure Standard providing that "no [s]tate . . . may directly or indirectly establish . . . any requirement relating to the labeling or disclosure of whether a food is bioengineered . . . that is not identical" to the federal standard. 7 U.S.C. § 1639b(e). In finding that plaintiffs' unfair-competition, false-advertising, and breach-of-warranty claims arising from a "non-GMO" label on infant formula were not preempted, the *Kao* court relied on two critical facts, neither of which exist in this case. First, it noted the absence of any federal preapproval, specifically declining to follow two FMIA cases on the basis that they "involve[d] labeling that had been pre[]approved by a regulatory agency[] or that explicitly

18

complied with federal law." *Kao*, 2017 WL 5257041, at *6–8 (citing *Brower*, 2017 WL 1063470, at *3, and *Barnes*, 2013 WL 5530017, at *5). Second, the *Kao* court noted, as a supporting reason for finding the claims not preempted, that the claims "[we]re consistent with the current USDA guidance." *Id.* at *8. Here, by contrast, defendants' labels were preapproved, and plaintiffs' claims are not consistent with the FSIS's guidance. We therefore find *Kao* unpersuasive in this case.

In sum, each of plaintiffs' state-law labeling claims—unjust enrichment, breach of warranty, violation of the UPA, and violation of state antitrust law—attempt to establish a labeling requirement different than that imposed and approved by the USDA and the FSIS under federal law. These claims are therefore preempted under § 678,[11] and we affirm the district court's decision on that ground, without reaching its alternative holdings or plaintiffs' various challenges to those alternative holdings.[12]

---

[11] Our preemption ruling is further supported by the executive order plaintiffs highlight in a letter of supplemental authority. *See* Fed. R. App. P. 28(j). Plaintiffs point to the portion of the order directing the Secretary of Agriculture to "consider initiating a rulemaking to define the conditions under which the labeling of meat products can bear voluntary statements indicating that the product is of United States origin, such as 'Product of USA.'" Aplt. Rule 28(j) Letter, July 21, 2021 (quoting Exec. Order No. 14,036, Promoting Competition in the Am. Econ., 86 Fed. Reg. 36987, 36993 (July 9, 2021)). And although plaintiffs contend that this order "directly supports" their position that defendants "are engaged in using voluntary deceptive practices to mislead consumers," it does nothing to overcome the preemption issue. *Id.* Instead, as defendants assert, the order's instruction "to consider initiating rulemaking to change [the] labeling requirements" simply "reinforces the conclusion that [plaintiffs'] claims are preempted under [the] current rules." Aplee. Rule 28(j) Letter, July 23, 2021.

[12] We do not—as the dissent contends—"assert that beef raised and even slaughtered in other countries can legally be said to be a product of the United States

## II.    False-Advertising Claims

The district court dismissed plaintiffs' false-advertising claims for several reasons, including that the complaint alleged "third[ ]parties and not [defendants] themselves produced the false advertisements." App. vol. 2, 559. On appeal, plaintiffs do not dispute the district court's assessment that defendants did not produce the allegedly false advertisements; instead, they argue that the district court erred by failing to join those third parties as indispensable parties.

But this is not an issue of indispensable parties. It is an issue of plaintiffs' inadequate pleading. *See* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). As defendants point out, the complaints barely reference advertising (each use the word "advertising" only twice, in complaints that are over 20 pages long and include over 65 numbered paragraphs) and include only conclusory assertions regarding defendants' participation in such advertising. The complaints also each include a single paragraph composed of pasted images of labels and advertising, images that appear to show that the advertising was created by third-party retailers, not defendants. And again, plaintiffs do not challenge the district court's conclusion that they failed to allege *defendants* engaged in false advertising; nor do they rebut, in their reply brief, defendants' similar assertion on appeal. Thus, we conclude that

---

of America merely because it was packaged here for retail sale." Dissent 1. On the contrary, we offer no opinion on the FSIS's broad interpretation of the meaning of the "Product of the U.S.A." label. We simply hold that plaintiffs cannot use their state-law claims as a mechanism for bypassing federally approved labeling.

plaintiffs' complaints do not state a false-advertising claim against defendants, and we affirm the district court's dismissal of the false-advertising claims on that basis.[13]

## Conclusion

Because plaintiffs' state-law claims are preempted by federal law and because plaintiffs fail to state a claim against defendants for false advertising, we affirm the district court's orders dismissing their complaints and denying leave to amend as futile. As a final matter, we grant the motion to file an amicus brief.

---

[13] In so doing, we express no opinion on the district court's alternative holding that the false-advertising claims would be preempted.

20-2124, Thornton, et al. v. Tyson Foods, Inc., et al.

**LUCERO**, Senior Circuit Judge, dissenting:

This case poses a meaty question of statutory interpretation: did Congress intend to preclude states from regulating beef labels that blatantly deceive consumers? The text, history, and purpose of the Federal Meat Inspection Act (FMIA) reveal that Congress could not have intended such a result. Rather, the statute expressly creates concurrent state jurisdiction, utilizing our federalist system to protect consumers against false and misleading meat labeling. See 21 U.S.C. § 678. In this case, plaintiffs' state law claims that beef labels mislead consumers as to cattle's country of origin are perfectly consistent with this federal goal. My respected colleagues in the majority disagree, they assert that beef raised and even slaughtered in other countries can legally be said to be a product of the United States of America merely because it was packaged here for retail sale. Thus, I respectfully dissent.

I agree with my colleagues that questions of express preemption turn on the plain text of the statute. Puerto Rico v. Franklin Cal. Tax-Free Tr., 579 U.S. 115, 125 (2016); EagleMed LLC v. Cox, 868 F.3d 893, 903-05 (10th Cir. 2017). However, when express preemption language is susceptible to equally "plausible alternative reading[s]," we "have a duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005). This is especially true when "Congress has legislated in a field which the States have traditionally occupied." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (cleaned up). Because food safety and labeling are quintessential domains of state power, any ambiguity in the FMIA's preemption clause

1

should be resolved against preemption.  See Plumley v. Massachusetts, 155 U.S. 461, 472 (1894) ("If there be any subject over which it would seem the states ought to have plenary control . . . it is the protection of the people against fraud and deception in the sale of food products.").  Although my colleagues in the majority advance a plausible reading of the FMIA, my interpretation of the Act leads me to adopt an equally plausible alternative that cuts against preemption.  See Bates, 544 U.S. at 449.

## I

Before turning to the text, the FMIA's history and purpose are instructive, revealing Congressional intent to create a regulatory regime characterized by cooperation between the federal government and the states.  President Theodore Roosevelt signed the FMIA into law in June 1906—just months after Upton Sinclair's famous muckraking novel, The Jungle, exposed horrific health and safety conditions in Chicago's slaughterhouses and meat packing facilities.  See Federal Meat Inspection Act of 1906, Pub. L. 59-382, 34 Stat. 669 (codified as amended at 21 U.S.C. § 601 et seq.); Upton Sinclair, The Jungle (Doubleday, Page & Co. 1906).[1]  In response to Sinclair's

---

[1] Sinclair's work was hardly the public's first exposure to problems in the meat industry.  In 1898, the industry came under fire for supplying rotten canned beef to American troops fighting in Cuba amidst the Spanish-American War.  James Harvey Young, The Pig That Fell Into the Privy: Upton Sinclair's 'The Jungle' and the Meat Inspection Amendments of 1906, 59 Bulletin H. Med. 467, 468-69 (1985).  Soon-to-be President Roosevelt, a Colonel fighting as a "Rough Rider" in Cuba at the time, refused to eat the "embalmed beef."  Id.  Moreover, at the dawn of the trust-busting era, scholars and journalists had long noted the "Beef Trust's" monopolistic efforts to raise consumer prices and reduce competition from small, independent cattle farmers.  Id. at 468; see also generally Francis Walker, The 'Beef Trust' and the United States Government, 16 Econ. J. 491 (1906).

revelations, President Roosevelt commissioned the Neill-Reynolds Report, which conducted surprise inspections of meat packing facilities and substantially confirmed Sinclair's allegations, expounding on the dangers to public health, meat packing workers, and the integrity of markets.  See Arlene Finger Kantor, Upton Sinclair and the Pure Food and Drugs Act of 1906, 66 Am. J. Pub. H. 1202, 1204-05 (1976).  The FMIA was signed into law less than two months after the Report's publication.  Id. at 1205.

Against this backdrop, it is hardly surprising that Congress intended to create a sweeping, federalist regulatory scheme.  In its statement of findings, Congress noted that "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat . . . [is] properly marked, labeled, and packaged," citing concerns about public health, small cattle farmers, and unfair competition.  21 U.S.C. § 602.  This sweeping declaration reveals a clear intent to protect consumer safety and market integrity.  But these efforts were not delegated to the federal government alone.  Rather, the Act's provisions were meant to be enforced "by the Secretary [of Agriculture with] cooperation by the States and other jurisdictions."  Id. (emphasis added).  Indeed, the FMIA is littered with references to state and federal cooperation to protect consumers.  See, e.g., § 661 ("It is the policy of the Congress to protect the consuming public from meat . . . that [is] adulterated or misbranded and to assist in efforts by State and other

3

Government agencies to accomplish this objective."); § 678 (conferring concurrent enforcement jurisdiction to the states).[2]

## II

Keeping the FMIA's history and purpose in mind, I turn to its text. In substance, the Act allows only the sale of beef with labels that "are not false or misleading and which are approved by the Secretary" of Agriculture. 21 U.S.C. § 607(d). To effectuate this ban on misleading labels, the USDA promulgated a regulation prohibiting any label that "conveys any impression or gives any false indication of origin." 9 C.F.R. § 317.8(a). However, the Food Safety and Inspection Service (FSIS), a group within the USDA, issued a policy guidance booklet providing that a meat product "may bear the phrase 'Product of the U.S.A.'" if "[t]he product is processed in the U.S." FSIS, Food Standards and Labeling Policy Book at 147 (2005), https://www.fsis.usda.gov/sites/default/files/import/Labeling-Policy-Book.pdf [hereinafter "FSIS Policy Book"]. In this case, plaintiffs challenge defendants' practice

---

[2] The majority discusses more recent history, including a law in place from 2008 to 2015 that more tightly regulated country-of-origin labeling and was Congressionally repealed following WTO proceedings and imposition of tariffs against the United States. (Op. at 7-8.) As the majority's own authorities make clear, however, Plaintiffs are not seeking to reimpose the same labeling regime established by the repealed statute. (Id.) For example, the statute affirmatively required disclosure of foreign beef's country of origin. Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, § 11002, 122 Stat. 923, 1351-53 (2008); see also Joel L. Greene, Country-of-Origin Labeling for Foods and the WTO Trade Dispute on Meat Labeling, Cong. Rsch. Serv., RS22955 at 4 (2015). On appeal, plaintiffs merely contend that New Mexico law prohibits "Product of the U.S.A." labeling for cattle that are born and raised in other countries. If Congress wishes to preempt such a claim, it is free to do so by enacting a new statute. Likewise, the USDA can promulgate a formal rule. See infra n.3 (explaining that mere agency guidance does not have the same preemptive effect as formal rules).

4

of importing cattle from other countries, slaughtering or processing them in the United States, and labeling the resulting meat a "Product of the U.S.A.," in what, but for the district court's summary dismissal, would appear to be a clear violation of New Mexico law. My colleagues conclude, however, that these state claims are preempted by the FMIA because the FSIS preapproved defendants' labels and therefore they cannot be "false or misleading," pursuant to § 607(d). (Op. at 13-14.)

To arrive at this conclusion, the majority relies on the FMIA's express preemption clause. In relevant part, that clause reads: "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any state or Territory . . . ." § 678 ("preemption clause"). However, the same provision also provides that states are free to "exercise concurrent jurisdiction" with the federal government "for the purpose of preventing the distribution . . . [of] misbranded" meat products, so long as concurrent state regulation is "consistent with the requirements" of the FMIA. Id. ("concurrent jurisdiction clause").

Everyone agrees that this case turns on the interaction of those two clauses. Read together, they suggest that states are free to regulate meat labels so long as such regulations are consistent with the FMIA and do not add to the requirements imposed by the Act. The inquiry thus becomes whether plaintiffs' state law claims deviate from or add to FMIA labeling requirements. I conclude they neither deviate from nor add to the Act because plaintiffs merely invoke New Mexico law consistent with the Act's express prohibition on misleading labels.

5

The plain text of the FMIA demonstrates that FSIS approval of a label is not conclusive as to whether the label is unlawfully misleading. The Act allows the sale only of meat products with labels that "are not false or misleading <u>and</u> which are [pre]approved by the Secretary." § 607(d) (emphasis added). This conjunctive language suggests that mere agency approval does not suffice to satisfy the statute. Rather, the Act contemplates the existence of—and indeed proscribes—labels that are both misleading and approved by the Secretary. In this context, the most natural reading of § 678's concurrent jurisdiction clause is as an attempt to close the resulting gap by allowing states to enforce the Act's prohibition against misleading labels when the agency declines to do so. This construction has the benefit of according with the federalist history of the FMIA. Because we are dealing with a traditional regulatory domain of the states, it is this equally plausible construction of the statute—the one disfavoring preemption—that we are required to accept. See <u>Bates</u>, 544 U.S. at 449; <u>Medtronic</u>, 518 U.S. at 485.[3]

---

[3] Having established that FSIS approval does not necessarily render a label compliant with the FMIA, the question remains whether approval of defendants' labels in this case is sufficient. Defendants point only to the FSIS Policy Book for the proposition that their labels comply with the FMIA's regulatory regime. <u>Policy Book</u>, <u>supra</u> at 147. Several of our sibling circuits have held that mere agency guidance, as opposed to statutes or formal regulations, is not automatically entitled to preemptive effect. <u>See, e.g.</u>, <u>Good v. Altria Group, Inc.</u>, 501 F.3d 29, 51 (1st Cir. 2007); <u>Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.</u>, 903 F.2d 445, 453-54 (7th Cir. 1990); <u>Reid v. Johnson & Johnson</u>, 780 F.3d 952, 962-65 (9th Cir. 2015); <u>Fellner v. Tri-Union Seafoods, LLC.</u>, 539 F.3d 237 (3d Cir. 2008). Because the FSIS Policy Book is accompanied by a disclaimer that its contents "do not have the force and effect of law and are not meant to bind the public in any way," it is hard to derive Congressional or agency intent for such guidance to preempt state law. FSIS, <u>Food Standards and Labeling Policy Book</u>, https://www.fsis.usda.gov/guidelines/2005-0003.

This case presents a paradigmatic example of the federal-state balance Congress intended in enacting the FMIA. At a minimum, it is plausible that the label "Product of the U.S.A." misleads consumers to believe that the beef they purchase derives from cattle born and raised in the United States. To the extent consumers are deceived, the labels violate both the FMIA's ban on misleading labels, 21 U.S.C. § 607(d), and the USDA's own regulation barring any beef label "giv[ing] any false indication of origin." 9 C.F.R. § 317.8(a). Taking this plain text alongside the history and purpose of the FMIA, Congress most assuredly could not have intended to rubber stamp deception as to the national origin of beef. Rather, the statute explicitly enlists states in the fight to protect consumers by creating concurrent jurisdiction to regulate misleading labels. Because plaintiffs merely invoke state law to enforce this ban, their claims are perfectly consistent with the Act and thus covered by its concurrent jurisdiction clause.

## III

Upton Sinclair famously quipped that the meat industry "use[s] everything about the hog except the squeal." The Jungle, supra at 38. The federal government enacted the FMIA to end that industry's sordid practice. Yet rather than monopolizing the field, Congress created a regulatory framework in which federal and state actors work together

---

The majority cites several cases for the proposition that FSIS approval is dispositive that defendants' labels are not misleading. (Op. 11-15.) But these cases are all distinguishable because they did not rely on mere agency guidance to support a finding of preemption. See, e.g., Webb v. Trader Joe's Co., 999 F.3d 1196 (9th Cir. 2021). To the extent other courts find that FSIS approval based on guidance does preempt state law, we should decline to adopt that holding as contrary to the text and purpose of the FMIA.

to protect consumers from unsafe and deceptive meat labeling. The text, history, and purpose of the FMIA all point toward the same conclusion: Congress could not have intended to authorize outright deception in meat labeling. Plaintiffs invoke state law to challenge precisely this sort of label, alleging that defendants mislead consumers about the origin of their beef products. As a result, plaintiffs' New Mexico claims are wholly within the confines of the FMIA's regulatory regime and do not add to the Act's dictates. Because this reading of the FMIA is just as plausible as the majority's, we are required to err against finding preemption. See Bates, 544 U.S. at 449; Medtronic, 518 U.S. at 485.

Accordingly, I would reverse dismissal of plaintiffs' complaint on preemption grounds and remand for further proceedings consistent with these views.[4]

---

[4] Because I would reverse on the preemption conclusion, it is also necessary to discuss the district court's alternative holdings. The court's dismissal of plaintiffs' New Mexico Unfair Practices Act, unjust enrichment, and antitrust claims all depend at least in part on FSIS approval of defendants' labels. Because such approval is not conclusive that labels are fair, accurate, or lawful, I would reverse these dismissals and allow these claims to proceed as well. I concur with the majority that the district court properly dismissed plaintiffs' false advertising claim.

8